Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 4157 | **DATE** | 3/22/2001 |
| **CASE TITLE** | Niebur, et al. Vs. Town of Cicero, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by agreement/pursuant to]
   ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order granting plaintiffs' motion to bar expert opinion of Patrick Murphy (120-1).

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 7 number of notices | Document Number |
| | No notices required. | | | |
| ✓ | Notices mailed by judge's staff. | | MAR 23 2001 date docketed | 163 |
| | Notified counsel by telephone. | | | |
| | Docketing to mail notices. | | docketing deputy initials | |
| | Mail AO 450 form. | | 3/22/2001 date mailed notice | |
| | Copy to judge/magistrate judge. | | | |
| MPJ | courtroom deputy's initials | Date/time received in central Clerk's Office | MPJ mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID R. NIEBUR and PHILLIP T. BUE, <br> Plaintiffs, <br><br> v. <br><br> TOWN OF CICERO, BETTY LOREN-MALTESE, individually, MERRICK SCOTT RAYLE, individually, THE BOARD OF FIRE, POLICE, AND PUBLIC SAFETY COMMISSIONERS OF THE TOWN OF CICERO, and CLARENCE GROSS, individually, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 98 C 4157 |

## MEMORANDUM OPINION AND ORDER

I here consider the admissibility of expert testimony by a former big-city police superintendent as to the reasonableness of the judgment exercised by David Niebur in his capacity as Police Chief of the Town of Cicero, Illinois, and by Phillip T. Bue, Deputy Police Chief. In April 1998, Niebur and Bue began to cooperate with federal authorities who were investigating public corruption in Cicero, including the relations of Town officials to Ram Recovery, Inc., a towing firm under contract to the Town that was apparently stealing and selling some of the cars it towed. The

Cicero Town counsel, Scott Rayle, cleared Town officials of wrongdoing. Meanwhile, Betty Loren-Maltese, President of the Town Council, suspended Niebur and Bue when they refused to answer questions about their grand jury testimony, and Rayle then asked the Police Board to fire them, which it did that fall. They sued under various constitutional and state law causes of action.[1] The defendants argue that they were fired for legitimate reasons, and now offer the expert testimony of former New York City Police Commissioner Patrick Murphy in support of that claim. The plaintiffs ask me to bar Murphy's testimony, and I do so.

Rule 702, governing the admissibility of expert testimony, now

---

[1] These included federal claims under 42 U.S.C. § 1983 for suspending and terminating the plaintiffs in violation of due process and in retaliation for exercise of their First Amendment rights, and state law claims for breach of contract, intentional infliction of emotional distress, retaliatory discharge, and malicious prosecution. In a previous opinion I dismissed some of the claims as against some of the defendants.

The testimony proffered here would apparently go to the retaliation claims, by way of showing that the plaintiffs were not retaliated against for legitimate exercise of legally protected rights, or even if they were, there was a nonretaliatory reason to fire them. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977) (no First Amendment claim if same decision would have been reached anyway).

The proffered testimony would not appear to be relevant to the other claims, although the expert offers unsupported conclusory opinions that pertain to some of them, e.g., the contract claims. Therefore, even were I to allow the testimony, and it was credited for the claims to which is relevant, it would not be decisive in the case.

-2-

reads:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This rule essentially codifies the principles enunciated in the line of cases following *Daubert v. Merrill Dow Pharm. Inc.*, 509 U.S. 579 (1993), requiring that expert testimony must be reliable to be admissible. The current version explicitly adds three new statutory requirements: sufficient facts and data, reliable methodology, and reliable application of the methodology. There is a two step procedure for evaluating expert testimony under Rule 702. *United States v. Hall*, 165 F.3d 1095, 1102 (7th Cir. 1999). First, I must "consider whether the testimony has been subjected to the scientific method; [I] must rule out 'subjective belief or unsupported speculation.'" *Id.* (citation omitted). The *Daubert* standard applies to all expert testimony, "whether it relates to areas of traditional scientific competence or whether [as here] it is founded on engineering principles or other technical or specialized expertise." *Kumho Tire Co., Ltd. v. Carmichael*, 526

U.S. 137, 141 (1999). My focus is on "an examination of the expert's methodology. The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact . . . ." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 1999).

Second, I must "determine whether the evidence or testimony assists the trier of fact in understanding the evidence or in determining a fact in issue." *Hall*, 165 F.3d at 1102. If the testimony would not be helpful, I may not admit it even if it is produced by a reliable method and based on sufficient facts and data. Here, Murphy's testimony passes none of the Rule 702 hurdles.

The issue before me involves specialized knowledge rather than scientific expertise. Murphy has published a small number of scholarly articles on policing and served briefly as professor at John Jay College of Criminal Justice on New York (1985-87). However, his main claim to expertise is his extensive experience rather than his scholarly credentials. So far so good: Rule 702 "specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Walker v. Soo Line Ry. Co.* 208 F.3d 581, 591 (7th Cir 2000); Fed R. Civ. P. 702 (An expert may

be qualified by "knowledge, skill, experience, training, or education."). Murphy was, among other things, Police Commissioner of New York City (1970-73) and Detroit (1969-70), Public Safety Director in Washington D.C. (1967-68), and Police Chief of Syracuse, N.Y. (1962-64). Since retiring from active duty, he has been President of the Police Foundation (1973-85); most recently he has been the Director of the American Police Association of College Graduate Officers and Associates. He himself received his B.A. from St. John's University and a Master of Public Administration from City College of New York. He is a graduate of the FBI National Academy in Quantico, Virginia. He is qualified to offer an expert opinion on various technical aspects of policing. However, nothing in his education or experience suggests that he is especially qualified to pronounce on political philosophy, a point the relevance of which will become unfortunately clear. In addition, Murphy offers no evidence that he is especially qualified to discuss the particular issue he addresses here, whether Niebur and Bue acted properly in investigating their elected superiors whom they suspected of corruption and other criminal activity.

My "reliability analysis does not end with its conclusion that an expert is qualified to testify about a given matter. Even "'[a] supremely qualified expert cannot waltz into the courtroom and

-5-

render opinions unless those opinions are based upon some recognized scientific method.'" *Smith,* 215 F.3d at 718. An expert may not "offer[] the court his CV rather than his [technical] skills. Judges should not be buffaloed by unreasoned expert opinions." *Mid-State Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333, 1340 (7th Cir. 1989) (citing Learned Hand, *Historical and Practical Considerations Regarding Expert Testimony,* 15 *Harv. L. Rev.* 40 (1901)). An expert opinion "is no better than the soundness of the reasons supporting it." *Libas, Ltd. v. United States,* 193 F.3d 1361, 1366 (Fed. Cir. 1999) (citations omitted).

Murphy opines that Niebur was an "insubordinate subordinate" who forced Loren-Maltese to initiate his discharge because he would not follow orders. Following orders was necessary, he states, because a police department is a quasi-military organization that requires a clear chain of command. He offers the view that because there are many styles of policing, a police chief should "adjust to a mayor's style rather than vice versa," and that "[a] mature and ethical chief, unable to remain loyal to a [mayor] who is not about to resign or be removed[,] resigns himself."

Murphy states that it was unreasonable of Niebur to regard Loren-Maltese as a suspect on the basis of "rumors, hearsay

-6-

statements of officers, employees, or reporters, FBI gossip, hunches, suspicion or allegations . . . , " although he does not say what would be sufficient basis for investigating suspicions of corruption if that sort of evidence was excluded. Murphy speculates that Niebur (and Bue too) "may also have . . . feared" the FBI because of the fearsome legacy of J. Edgar Hoover. He concludes that when Niebur "separated his administration of the Police Department from the oversight of the Town President he effectively voided his legal ability to command." He describes Niebur's action as an "attempted power grab" and an attempt to "assume the powers of the Town President." Murphy suggests that actions like Neibur's are "a threat to our most fundamental principles of liberty."

Murphy says that his criticisms of Niebur apply as well to Bue, and, referring to Bue's employment contract, states that he was "grossly negligent" in attempting to do his job without reading the Department Rules and Regulations because these vary a great deal across departments. Murphy asserts that in investigating his boss, the Town President, Bue violated his employment contract and the Cicero Code of Ordinances, and showed that he lacked the judgment and maturity required of his job.

As the language of Rule 702 itself suggests, a threshold question is whether Murphy's testimony would be helpful or "will

-7-

assist the trier of fact to understand the evidence or to determine a fact in issue." If so, I then consider whether it is reliable and sufficiently base on facts or data. In determining whether expert testimony would be helpful, I am to consider two factors: first, "whether the proffer demonstrated that a sufficiently reliable body of specialized knowledge existed." *United States v. Hall*, 93 F.3d 1337, 1342 (7th Cir. 1996). The Seventh Circuit warns that "it may be more difficult at times to distinguish between testimony that reflects genuine expertise--a reliable body of genuine specialized knowledge--and something that is nothing more than fancy phrases for common sense." *Id.* Second, I consider whether, "even if . . . the field in general qualifies for expert testimony, the proffered testimony [is] based upon the expert's special skills." *Id.* at 1343. Otherwise "the expert at best is offering a gratuitous opinion, and at worst is exerting undue influence on the jury that would be subject to control under Rule 403." *Id.*

In this case, it is possible that police administration is a reliable body of genuine specialized knowledge. I presume that, based on his extensive experience, there is something that Murphy could tell a jury about running a police department that would not be "fancy phrases for common sense." However, he does not attempt

to do so here. Instead, he offers "gratuitous opinions," *Hall*, 93 F.3d at 1343, that are not based on his specialized skills and address matters in which he is not expert and to which he may not testify.

Murphy offers opinions on whether Niebur and Bue acted reasonably or grossly negligently. The Seventh Circuit has in some circumstances upheld a district court's determination that an expert may testify as to legal or professional standards, although it has not required a district court to admit such testimony. But the Court of Appeals is crystal clear that an expert may not "improperly tell[] the jury why [a party's] conduct was illegal." *Haley v. Gross*, 86 F.3d 630, 645 (7th Cir. 1996). Expert witnesses are not allowed to draw "legal conclusions," *West v. Waymire*, 114 F.3d 646, 652 (7th Cir. 1997), but only to describe sound professional standards and identify departures from them. *Id.*

Murphy expressly draws legal conclusions, stating, *e.g.*, that the Town had "no choice" but to fire the plaintiffs. And rather than referring to professional standards for investigating an elected superior suspected of corruption, he attempts, first, to interpret a term in his employment contract with the town, allowing termination for "gross negligence", a matter within the exclusive

purview of the court, if (as here) the contract is clear. *Bourke v. Dun & Bradstreet*, 159 F.3d 1032, 1037 (7th Cir. 1998) (interpreting Illinois law). Second, in place of standards, Murphy offers some platitudes about chain of command in quasi-military organizations, the need to be sensitive to local variations in administration, and some views about divided powers in a free society. These thoughts do not require or invoke any expertise that he may have, and they do not set forth professional standards to which he may testify. *See Butera v. District of Columbia*, 235 F.3d 637, 660 (D.C. Cir. 2001) (quoting *District of Columbia v. Carmichael*, 577 A.2d 312, 315 (D.C. 1990) (Expert did not "identify any concrete standard upon which a finding of negligence could be based.")). Third, Murphy seeks to testify that Niebur and Bue were "insubordinate." It would not be helpful to hear Murphy restate what is already conceded, that the plaintiffs did not follow the mayor's directions. The issue is whether they were justifiably insubordinate, and to that Murphy may not testify as he does in his report, without reference to objective standards and professional norms.

But even if Murphy had offered testimony on applicable investigative standards of something within the purview of his

expertise the admissibility of which I might consider, his testimony would have to be based on sufficient facts or data, and involve the reliable application of a reliable methodology. It is neither. With regard to reliance on "sufficient facts and data," Murphy's sources are basically some of the discovery material in the case. Apart from this, he did not "rely on any written product when presenting his expert opinion." *Id.* (citing *Toy v. District of Columbia*, 549 A.2d 1, 8 (D.C. 1988)). For example, he did not rely on any of the available evidence of the charges against Cicero officials that Niebur and Bue were investigating; or evidence of the history, policies, and practices of the town of Cicero. As already noted, he refers to no published standards as to how a police official investigates public corruption and official crime. He states that he has learned to defer to the mayor from "text books," but he does not give any citations.

Use of published material is not required, but Murphy has no acceptable alternative source. It is stated in the defendant's memorandum of law that Murphy used "his own knowledge and expertise of law enforcement procedures." That might be okay if it were true, but it is not true. Murphy specifically claims expertise in suppressing riots and urban disorders, as he did in Washington,

D.C., in 1968. He does not state that he ever had occasion to investigate suspicions of criminal behavior by his superiors. On his own approach, it would be surprising if he had done so. Therefore he does not refer to knowledge based on his own experience of how to deal with the problem Niebur and Bue faced.

Murphy's methodology is as defective as his sources. The expressly stated basis for Murphy's views are certain general ruminations on the nature of divided powers and representative government, that is, statements of political philosophy. (In discussing his philosophy, he also does not refer to any literature.) A chief's powers, he says, are "derivative" in a free society, specifically on powers of the elected official (here, the Town President or mayor) who embodies "the power of the people." Otherwise one has a "police state." Nothing in Murphy's extensive experience, however, qualifies him as a political philosopher; and political philosophy, although a very admirable activity, is not a a reliable method for reaching objective conclusions on which all reasonable persons can agree. *See, e.g.*, Richard A. Posner, *The Problematics of Moral and Legal Theory* 107ff (1999) (raising doubts about the applicability of moral theory to law); John Rawls, *Political Liberalism* (1993) (remarking on the irreducible diversity

of views on political philosophy in a modern society). With respect to political philosophy, everyone has a right to his own opinion, but speech that is protected under the First Amendment is not therefore and for that reason admissible as expert testimony.

Even if one were to accept the method, whatever that is, of political philosophy, it is not clear how Murphy derives the idea that a police official may never investigate his elected boss for suspected criminal activity unless she is about to resign or be removed. That certainly would not follow from the derivative nature of delegated powers. Neither does the doctrine follow from the idea that a police department is a quasi-military organization requiring a chain of command to be followed to perform its assigned tasks. Although somewhat more tightly tied to police work than ideas about delegated powers, this premise does not support the proposition that a police official who suspects that the mayor is a crook is duty bound to follow her orders or resign in silence rather than cooperate with a federal investigation.[2] The conclusion is not connected to the premises by any reliable method of reasoning.

Moreover, Murphy's report is riddled with speculation and

---

[2] He states in his report that "[a] mature and ethical chief, unable to remain loyal to a Town President who is not about to resign or be removed[,] resigns himself."

inconsistencies. For example, he dismisses Niebur's and Bue's suspicions as founded on baseless FBI rumors; he guesses without any basis that they were afraid of the spectre of J. Edgar Hoover, and then states that today's FBI is a far cry from Hoover's; now, it is a responsible law enforcement agency and not a lawless secret police. I should hope so, but if so, why then was it wrong, indeed grossly negligent and utterly irresponsible, as Murphy claims, for Niebur and Bue to rely on the FBI's suspicions of Loren-Maltese? This is a matter of logic, a key methodological point.

I do not, of course, evaluate the correctness of Murphy's conclusions here, but merely determine that they are not supported by the reasons he offers for them. Because he has not used a reliable method, he has not correctly applied such a method either. For all these reasons, Murphy's testimony would not be helpful to the jury and is neither founded on sufficient facts or data nor produced by correct application of a reliable method. I GRANT the motion to exclude his testimony.

ENTER ORDER:

_____

**Elaine E. Bucklo**
United States District Judge

Dated: March 22, 2000