# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 4157 | **DATE** | 5/15/2002 |
| **CASE TITLE** | Niebur, et al. vs. Town of Cicero, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  Plaintiffs' motion to reconsider (293) my order of March 29, 2002 is granted in part and denied in part. The Memorandum Opinion and Order dated 3/29/02 is vacated and the attached Amended Memorandum Opinion and Order is substituted in its place. The defendants' motions to reconsider the order of March 29, 2002 (298, 299 and 300) are denied. This case is closed. Enter Amended Memorandum Opinion and Order.

(11) ■ [For further detail see order on the reverse side of the original minute order.]

| | No notices required, advised in open court. | | | 5 | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | | MAY 16 2002 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | 306 |
| | Mail AO 450 form. | | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 5/15/2002 | |
| | | | 02 MAY 15 PM 3:17 | date mailed notice | |
| MPJ | courtroom deputy's initials | | Date/time received in central Clerk's Office | MPJ | mailing deputy initials |

*Niebur v. Town of Cicero, et. al.,* 98 C 4157

In an order of March 29, 2002, I granted the defendants' post trial motions in part, among other things, allowing a new trial on the due process liberty claim. I relied upon an Illinois Supreme Court decision, *Bovinette v. City of Mascoutah*, 302 N.E.2d 313 (Ill. 1973), which, if good law, would dictate that result. The plaintiffs have called my attention to Illinois Public Act 80-819, legislatively overruling *Bovinette*, and to several cases supporting that interpretation. *See Robinson v. Akins,* No. 89 C. 5413, 1990 WL 71285, at *8-9 (N.D. Ill. May 7, 1990); *Gorr v. Bd. of Fire and Police Comm'rs,* 494 N.E.2d 1221, 1224 (Ill. App. Ct. 1986); *Mandarino v. Lombard,* 414 N.E.2d 508, 509 (Ill. App. Ct. 1980). Although *Bovinette* shows up as good law on Westlaw's Keycite, and the relevant headnotes keyed to the pertinent propositions do not disclose the references to the contrary cases plaintiffs cite, I conclude that plaintiffs are correct, and Loren-Maltese in effect concedes this. Accordingly I vacate the opinion and order of March 29, 2002, and substitute for it the attached amended opinion denying the defendants' motion for a new trial on the due process liberty claim, and making appropriate changes elsewhere. The reasoning is explained therein and I do not attempt to summarize it here. In view of that determination, I deny and deny as moot Rayle's motions for reconsideration, which depend in large part on the absolute immunity for prosecution, now denied, that I had been compelled to grant him in view of my original decision.

As to Loren-Maltese's further motions for reconsideration, I have reviewed them and found them meritless. The Town of Cicero's motions are also insufficient. I will remark that the effort, with regard to Bue's contract, to shift from the parol evidence argument to a contract integration argument never raised, must be unsuccessful, and, moreover, even were I consider the argument, I would have to reject it, because I would treat the later modification as a waiver of the integration clause. The rest of the defendants' arguments are even less meritorious than this.

Plaintiffs' motion to reconsider my order of March 29, 2002 is GRANTED IN PART AND DENIED IN PART. That order is VACATED and the attached amended memorandum opinion substituted in its place. The defendants' motions to reconsider that order are DENIED.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID R. NIEBUR and PHILLIP T.
BUE,
               Plaintiffs,

v.

TOWN OF CICERO, BETTY LOREN-
MALTESE, individually, MERRICK
SCOTT RAYLE, individually, THE
BOARD OF FIRE, POLICE, AND
PUBLIC SAFETY COMMISSIONERS OF
THE TOWN OF CICERO, and
CLARENCE GROSS, individually,

               Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

No. 98 C 4157

**DOCKETED**

MAY 16 2002

## AMENDED MEMORANDUM OPINION AND ORDER

David Niebur and Philip Bue were hired as police chief and
deputy police chief of the Town of Cicero, Illinois, Niebur in
December 1997, and Bue in March 1998, supposedly to clean up an
admittedly corrupt, factionalized, and otherwise troubled police
department. For some months, they got along well with the Town
President, Betty Loren-Maltese, who had much public praise for the
plaintiffs' performance. However, things changed when they began to
investigate suspected wrongdoing involving, among other things,
relations between town officials and Ram Recovery, Inc., a towing
firm under contract to the Town that was apparently engaged in
selling stolen cars, as well as rumors that Town police officers
were improperly deleting entries about stolen cars from official



records. They communicated with the FBI and other federal investigators looking into suspected wrongdoing in Cicero.[1] On April 23, 1998, Niebur and Bue were subpoenaed to testify before a federal grand jury. The following day, April 24, Loren-Maltese suspended them after they declined to answer questions put to them by Merrick Scott Rayle, a private attorney contracted to do work for the Town of Cicero, about their investigation and proposed grand jury testimony. Rayle subsequently investigated the towing scandal and submitted a report in which he exonerated all Town officials. In May 1998, Rayle filed dismissal charges against Niebur and Bue before the Board of Fire, Police, and Public Safety Commissioners (the "Police Board"). Bue was reinstated, but then fired in November 1998, supposedly because he had failed to comply with Cicero's residency requirement. Niebur was never reinstated.

Niebur and Bue filed this lawsuit under 42 U.S.C. § 1983 alleging various constitutional and state law causes of action. After a jury trial, the defendants were found liable for various violations of the plaintiffs' legal rights. Loren-Maltese and Rayle were found liable for violations of Niebur's and Bue's due process liberty interests in their jobs and for malicious prosecution. The Town of Cicero ("Cicero" or "the Town") was found liable for violations of the plaintiffs' First Amendment Rights, their due

---

[1] Loren-Maltese has subsequently been indicted on federal criminal charges relating to corruption in Cicero.

-2-

process property and liberty rights, breach of contract, retaliatory discharge, and malicious prosecution. The Board of Fire, Police, and Public Safety Commissioners (the "Police Board") was also found liable for several violations. The defendants were collectively taxed over a million and a half dollars in compensatory and punitive damages. Loren-Maltese, Rayle, the Town and the Police Board move for judgment as a matter of law under Fed. R. Civ. P. 50(b) or for a new trial under Rule 50(e) and (c). I grant the motions in part and deny them in part.

I. Loren-Maltese

A. Evidentiary Rulings

1. *Introduction*

In her 58-page brief ("Loren-Maltese JML Brief") and 49-page reply brief ("Loren-Maltese Reply Brief"),[2] Loren-Maltese argues that I made errors in excluding or admitting testimony and instructing the jury, the cumulative effect of which was to present a "skewed" picture of the defendants in a way that rendered the jury's verdict unreliable. *Frymire-Brinati v. KPMG Peat Marwick,* 2 F.3d 183, 188 (7th Cir. 1993). She contests dozens of my rulings,

---

[2] Although I gave permission to file briefs over the 15 page limit, it might be best not to dump the contents of counsel's filing cabinet on my desk, but to select just those arguments that are actually meritorious and expressible within or near the page limit. Justice Holmes predicted an unhappy fate for "a man who takes half a page to say what can be said in a sentence." Oliver Wendell Holmes, Jr., Letter to Frederick Pollock, June 1, 1917, *in* I *The Holmes-Pollack Letters* 245 (Mark DeWolfe Howe ed. 1941).

and also argues that I committed judicial misconduct, misunderstood or misapplied the law, and allowed the jury to return a verdict unsupported by sufficient evidence. I have tried to organize these arguments in a manageable way.

I begin with Loren-Maltese's challenge to rulings relating to the testimony of a number of witnesses.

1. *Patrick Murphy's Expert Testimony*

Loren-Maltese objects that I should have admitted the expert testimony of former New York Police Commissioner Patrick Murphy, which I barred as unreliable and unhelpful. *See* 136 F. Supp. 2d 915 (N.D. Ill. 2001). She offers no reason why my opinion was wrong, instead merely asserting that his testimony was reliable and based on substantial facts and data. "Normally one bald assertion is as good as another--but not when one party carries the burden of persuasion . . . ." *Olander v. Bucyrus-Erie Co.,* 187 F.3d 599, 608 (7th Cir. 1999).

2. *Col. Robert Johnson*

Loren-Maltese also argues that the prejudicial effect of excluding Murphy's testimony was aggravated because I erroneously denied her the opportunity to rebut the "opinion" testimony of Colonel Robert Johnson, formerly of the Illinois State Police (the "ISP"), who served as acting chief of police after May 1998, that the plaintiffs had done a good job as chief and deputy chief. She offers no citations to the record to support this argument, and

-4-

thus waives it. *See Groza v. I.N.S.,* 30 F.3d 814, 821 (7th Cir. 1994) (I need not "comb the record for meritorious claims" and "may . . . require, as we do, that litigants not only raise, but also support their arguments, both factually and legally. . . . [F]ailure to do so . . . results in waiver."). In any event I gave Loren-Maltese every opportunity to offer her views of the plaintiffs' accomplishments. The jury rationally did not accept the story that whatever limitations or defects existed in their job performance motivated Loren-Maltese to have them suspended and fired. Moreover, the plaintiffs *do* provide record cites, which show that Johnson gave a positive opinion based on *personal knowledge*, not opinion, about *Bue*'s (not Niebur's) performance under his supervision, to which the defendants did not then object, *see* Trial Tr. at 1196-97, and so they have again waived the point.

Loren-Maltese asserts, without developing the argument or offering factual support or legal authority, that Col. Johnson should not have been allowed to testify that Bue had done a good job as deputy police chief, that he had made earnest efforts to comply with Cicero's residency requirement, that Clarence Gross (who has been dismissed as a defendant), had mismanaged many aspects of his job, and that Loren-Maltese should have removed Gross from all Town positions. Here, Loren-Maltese does not even attempt to explain how this testimony was unfair or prejudicial. *See Freeman United Coal Mining Co. v. Office of Workers' Comp.*

*Programs*, 957 F.2d 302, 305 (7th Cir. 1992) ("[I] have no obligation to consider an issue that is merely raised . . . , but not developed in a party's brief."). In any event, the objection lacks merit. I have addressed Johnson's opinion of Bue's job performance above; Gross is no longer a party; and Loren-Maltese and the Board had ample opportunity to impeach Johnson's views about Bue's satisfaction of the residency requirement. *See* Trial Tr. at 1196-97.

3. *William Bacon*

Loren-Maltese objects that I allowed William Bacon to offer improper opinion testimony that Rayle's practice with respect to disciplinary matters was to "shoot first and ask questions later," and that Bue did a good job as deputy police chief. The statement about Rayle is opinion testimony, but not improper under Rule 701: these were matters of which Bacon had first-hand knowledge and about which his view might be helpful to the jury. Bacon did not testify that Bue had done a good job as deputy, although if he had so testified that would be proper opinion testimony, but that he told Rayle that Bue "shouldn't be suspended." Trial Tr. at 1053.

4. *Col. William Davis*

Loren-Maltese argues Colonel William Davis of the ISP should not have been allowed to testify that no subpoena was required for the ISP to take records from the plaintiffs. This supposedly tainted the jury's view of the malicious prosecution charge by

-6-

suggesting that there was no probable cause for disciplinary action against the plaintiffs. Fed. R. Evid. 701 permits opinion testimony by lay witnesses that is based on the (a) witnesses' perception, (b) helpful to a clear understanding of the facts, or (c) not based on technical knowledge. The issue was why the ISP had not obtained a search warrant or subpoena for these records. Davis testified that he thought that a subpoena was unnecessary because Niebur was the chief law enforcement officer of Cicero, and if anyone could give the ISP the records, it was Niebur. Trial Tr. at 958. This explanation was helpful to understanding the ISP's behavior, and it was within Davis' own first hand knowledge. The defendants cross-examined Davis on the matter, *id.* at 983-87, and argued that the decision was the Town's, and Niebur was not authorized to make it, *id*. at 2020-21. Loren-Maltese was thus able to bring out any weaknesses in Davis's testimony. *See United States v. Allen*, 10 F.3d 505, 414 (7th Cir. 1993). I note as well that, as usual, I explained to the jury that I am the only authority in my courtroom on what the law is. There was no error here.

5. *Lieutenant Casey*

Lieutenant Casey of the ISP is supposed to have offered the improper opinion testimony that Niebur and Bue had a right to turn over certain records to the ISP on April 22, 1998. Loren-Maltese provides no legal authority to support her argument; and she did not object to this testimony on that basis, and her objection here

-7-

is conclusory. For all these reasons, the argument is waived. *See United States v. Haddon*, 927 F.2d 942, 956 (7th Cir. 1991). Moreover, the record does not support Loren-Maltese's characterization of Casey's testimony. Casey describes the facts about how Niebur and Bue gave her the towing records. *See* Trial Tr. at 991-1003. She says she did not *believe* that she required a subpoena or a search warrant, *id.* at 993, but that is a very different matter from the proposition imputed to her by Loren-Maltese. There was no objection to this testimony.

6. *Niebur and Bue on their State of Mind*

Loren-Maltese objects that I erred in permitting the plaintiffs to testify as to their states of mind as a result of hearsay. She does not identify any particular testimony that is objectionable, and so, because she has not even given me a clue as to what she was talking about, she has waived this objection insofar as she has made it at all. I note, however, that a statement not offered for the truth of the matter asserted is not hearsay. Fed. R. Evid. 801(c). Loren-Maltese asserts that the state of mind of the employee is irrelevant; "only the state of mind of the employer is at issue." At issue in what? Loren-Maltese doesn't say. She refers me to argument "below" with no specific cross reference. That's not good enough.

7. *Niebur and Bue on the Scope of Their Job*

Loren-Maltese objects that I erred in allowing Bue and Niebur

-8-

to testify as to "the scope of their job," and in particular whether it included cooperating with other law enforcement agencies. She says that the error was that before trial I had "determined that the scope of Plaintiffs' employment was a matter of law." Loren-Maltese offers no citation for this. Neither does she explain what exactly I am supposed to have held the scope of their jobs to be. Moreover, she did not raise the objection at the appropriate time during trial. Trial Tr. at 1290-91. The objection is waived on multiple grounds, but would fail anyway. The defendants opened the door to it by arguing that the plaintiffs could not shelter behind the First Amendment because the communications with authorities were part of their duties. The defendants cannot object if Niebur and Bue rebutted their arguments about the scope of those duties.

7. *Niebur and Loren-Maltese on Lawsuits against Former Employers*

Loren-Maltese further objects that I wrongly excluded purported evidence that Niebur sued his superior in every town where he was previously employed, and excluded testimony from Loren-Maltese that she would not have hired Niebur had she known this beforehand. This does not accurately reflect the record. I permitted the defendants to explore the issue in opening statements and cross-examine Niebur over his lawsuits against his previous employers. Trial Tr. at 183-91, 196, 1411-16. I also permitted Loren-Maltese to testify that, had she known about Niebur's

-9-

background, she would not have hired him. Trial Tr. at 1650-51, 1662. However, she also said that she had already decided to fire Niebur when she learned about these facts. This also deals with Loren-Maltese's claim that I barred her from testifying about her state of mind at the time she suspended the plaintiffs on April 24, 1998, and the information then available to her. *See* Loren-Maltese JML Brief at 16-17. The argument unsupported by record citations, and, as the record citations that I provide above indicate, the claim is simply false: I allowed Loren-Maltese to testify as to her state of mind and the information that she had.

8. *Lisa Seno*

Loren-Maltese argues that I erred in not permitting the testimony of Lisa Seno, a switchboard supervisor whom Loren-Maltese said would have backed up her story that Niebur ordered a switchboard operator to withhold information about how many police officers were on the streets of Cicero. (Loren-Maltese offered, as a legitimate reason for his suspension, that he did not have enough officers on the streets.) However, as plaintiffs argue, Seno was properly barred because she was not listed as a witness.

9. *Juan Ochoa*

Loren-Maltese says that I should have permitted the testimony of Juan Ochoa, President and Chairman of the Cicero Mexican-American Democratic Organization. She says that he would have rebutted Niebur's version of the events at a Hispanic

-10-

businessperson's lunch, at which, she says, Niebur got drunk and made racist remarks, and this would have corroborated her own testimony. The testimony would, she says, also have countered a possible impression that Irene Saldana, discussed immediately below, spoke for the entire Hispanic community of Cicero. However, Niebur's testimony simply rebutted Loren-Maltese's testimony about the lunch, and Ochoa, presumably a corroborating witness for Loren-Maltese, was neither disclosed during discovery nor listed as a witness in the pretrial order.

## 10. *Irene Saldana*

In a similarly conclusory manner, Loren-Maltese objects that Irene Saldana, of the Interfaith Leadership Counsel of Cicero, offered improper opinion testimony when she said that Hispanics in Cicero "lost hope" when Niebur was fired. Again, Loren-Maltese does not explain why this opinion testimony was improper under Rule 701. Moreover, Loren-Maltese opened the door to such testimony by testifying that the Cicero Hispanic community was outraged by remarks Niebur made at a Hispanic businessman's lunch. Trial Tr. at 389. Saldana's testimony was offered in rebuttal. *Id.* at 740, 1206. *See Hasham v. California State Bd. of Equalization,* 200 F.3d 1035, 1050 (7th Cir. 2000) (No abuse of discretion when "defendant's line of questioning opened the door" to certain testimony).

## 11. *Rosemarie Esposito*

Rosemarie Esposito testified that she thought one of the

owners of Ram Recovery was lying when he said that he could not provide the town with certain records because of a "computer glitch." Loren-Maltese asserts that this was improper opinion testimony. At trial, however, Loren-Maltese objected on grounds of immateriality. Trial Tr. at 1079-80. Because she did not raise the Rule 701 objection there, and because she does not explain it here, the objection is waived. *See United States v. Biesiadecki*, 933 F.2d 539, 544 & n.1 (7th Cir. 1991) ("A defendant cannot advance one reason for admitting evidence during trial and then advance a wholly separate basis for admission in post-trial submissions or on appeal. An evidentiary rationale not raised before the trial judge at the time of ruling is waived."); Fed. R. Evid. 103(a)(1). The testimony was proper in any event under Rule 701, as it is based on first-hand knowledge and helpful to understanding the facts around Bue's requests for Ram Recovery records.

12.  *FBI Agent Stewart*

Loren-Maltese argues that the testimony of FBI Special Agent Robert Stewart was improper opinion testimony. She reiterates the argument made at trial that the plaintiffs attempted to create in the mind of the jury the erroneous impression that there was no probable cause for discipline because the plaintiffs were following FBI instructions. However, Stewart did not (and could not) testify as to what the plaintiffs thought they were doing, nor did he say that he, speaking for the FBI, gave them "instructions." Stewart

-12-

did testify as to his preferences, that he said he informed the plaintiffs that he did not *want* them to talk to anyone, Trial Tr. at 1035, 1042. That is not an opinion. It is also not an order, a fact that Loren-Maltese herself brought out on cross examination. *Id.* at 1035 ("Q: 'You did not order them?' A: 'I did not order them.'"). Loren-Maltese does not say what Stewart's supposed opinion was or why it was improper.

13. *Conversations with the FBI Agents*

Loren-Maltese adopts Rayle's treatment of whether it was proper to allow Niebur to testify about the statements to him by the FBI. No record citation to this testimony is provided, and it is not quoted, merely paraphrased or described. I am "not obliged to guess at a party's meaning," *Liu v. T & H Machine, Inc.*, 191 F.3d 790, 795 (7th Cir. 1999), or to "comb the record looking for the facts where a party has failed to provide specific citations." *Bonds v. Coca-Cola Co.*, 806 F.2d 1324, 1328 (7th Cir. 1986). As the plaintiffs note, they cannot respond to an objection about testimony without knowing what testimony is supposedly objectionable. Rayle and Loren-Maltese refer generally to testimony that FBI agents advised the plaintiffs not to cooperate with the Town's investigation of Ram Recovery. Rayle, JML Brief at 28. Objections to any other statements are waived for lack of identifiability.

Contrary to what the defendants contend, first, the testimony about the FBI agents' statements was not hearsay, *i.e.*, offered to prove the truth of the matter asserted, Fed. R. Evid. 801(c). The statements were rather offered to show the effect on the listener. *United States v. Hanson*, 994 F.2d 403, 406 (7th Cir. 1993). The truth of the statements did not matter. Moreover, as noted above, what the FBI agents in fact expressed was a wish, not an order, that the plaintiffs keep quiet.

Second, the defendants object that allowing the jury to hear the statements was error because there was no opportunity to cross-examine the agents on the subject at issue. They say that they were barred from doing this by an order entered by Chief Judge Aspen limiting their testimony because of then-ongoing grand jury proceedings. But the FBI's expressed wish that the plaintiffs not talk to anyone involved in the Town investigation was within the scope of matters into which the parties were permitted to inquire. Rayle and Loren-Maltese were free to cross-examine the agents on these topics before trial or at trial, and they did so. *See* Trial Tr. at 1035 ff. They have not in fact identified any matter into which they could not inquire that would be relevant to this case. At trial, virtually all their questions were answered. Moreover, even if they had not been free to inquire, that would not have mattered because, as noted above, the statements were offered for the effect on the listener and not for their truth, so the proper

-14-

subject of cross examination would be the *listeners*--the plaintiffs. The issue was, "Did the statement have that effect on them?", and not, "Was the statement true?".

According to Loren-Maltese, I improperly prevented her from "confronting" FBI Agents Stewart and Harnett during their depositions and trial "as to the investigation that was allegedly conducted by the FBI" with respect to the defendants, thus preventing the defendants from attacking the impression that the FBI had suspicions about them, and from attacking the plaintiffs' case-as characterized by Loren-Maltese--that the plaintiffs' actions were reasonable in the light of this unconfronted "suspicion, rumor, and innuendo" testimony. (Naturally the plaintiffs reject this characterization of their case, and correctly so.) Loren-Maltese fails to offer any record citations that provide a factual basis for assessing whether the jury might have gotten that impression, or to identify any legal basis for the argument. I can think of no legal basis: the Confrontation Clause, for example, does not apply in a civil context. Their interactions with the plaintiffs were fair game for either party, but no party was permitted to ask the FBI agents about the scope their investigations beyond a few questions concerning the fact that the plaintiffs had been served with federal subpoenas. Trial Tr. at 1021-51. Moreover, the defendants referred to the FBI investigation themselves. *Id.* at 1996.

-15-

14. *Oral Modification to Bue's Contract*

Bue offered trial testimony about an oral modification to his employment contract that allowed him more time to find a place to live and come into compliance with the Cicero residence requirement. As noted below, the contract imposed a 90-day limit on the time during which he could live outside the Town. Bue said that, when it proved hard for him to sell his out-of-Town house, Loren-Maltese orally told him: "'Don't worry about that. That's what extensions are for.'" Trial Tr. at 666. She argues now that admitting this testimony was improper because it violated the parol evidence rule. However, parol evidence is *prior or contemporaneous* evidence that, in the ordinary circumstances, may not be used to get around the terms of an *unambiguous and integrated* contract. *See Prentice v. UDC Advisory Services, Inc.*, 648 N.E.2d 146, 152 (Ill. App. Ct. 1995)(citing cases). Loren-Maltese says (without any citation to the record) that I held this contract to be unambiguous, although she does not say that I also held it to be integrated, and I never did. The objection is waived anyway because it was not raised at trial, *see* Trial Tr. at 592-93, 665-66, and it's manifest that the testimony was not parol evidence but evidence of a subsequent modification, and so admissible. "Parol evidence is admissible to establish a subsequent modification of a contract, and this rule has been applied to . . . written contracts." *Land of Lincoln Sav. & Loan v. Michigan Ave. Nat'l.*

-16-

*Bank of Chi.,* 432 N.E.2d 378, 384 (Ill. App. Ct. 1982).

15. *Excluding Sam Jelic's Last-Minute Testimony*

Sam Jelic was the Town's Superintendent of Public Works, and, while he was not a defendant here, he was involved in the events leading to the suspension and termination of the plaintiffs. He initially refused to testify, invoking at his deposition his Fifth Amendment privilege against self-incrimination even as to the name of his employer. I postponed trial for two weeks, in part so that Jelic could be deposed if he changed his mind about testifying. Following the continuance, his attorney informed counsel that he would still claim his Fifth Amendment privilege. Pretrial Conf. Tr., April 24, 2001, at 21. Suddenly, at trial, however, the Town claimed that Jelic was willing to testify, and if that if the plaintiffs refused to call him, they were not entitled to an instruction on an adverse inference. The defendants proposed to call him in their case if the plaintiffs did not use him as a witness. I declined to permit his last-minute testimony, and instructed the jury that they might infer from his non-appearance that his testimony would have been unfavorable to the Town.

Loren-Maltese fails to explain any error, saying only that the exclusion was harmful. She makes a claim about what he would have said, and asserts baldly that my ruling "improperly penalized individual defendants and affected the outcome of the trial." Nonetheless, the Seventh Circuit has held conclusively that if a

-17-

party waives his privilege against self incrimination "just prior to trial," when the opposing party lacked "sufficient opportunity to obtain discovery," it would be "error [for me] to exclude [the witnesses'] prior silence because the effect of such a ruling would be tantamount to allowing the witness to avoid discovery altogether." *Harris v. City of Chicago*, 266 F.3d 750, 754 (7th Cir. 2001) (citing *McGahee v. Massey*, 667 F.2d 1357, 1362 (11th Cir. 1982) ("A defendant cannot have it both ways . . . . [He may not] testify in attack . . . and at the same time seek refuge behind the shield of the Fifth Amendment.")). Jelic was an officer of the Town. Therefore, I did not err in excluding Jelic's testimony or in giving the contested instruction.

16. *Excluding Rayle's Last-Minute Testimony in the Defendants' Case*

Attorney Merrick Scott Rayle, under contract to the Town at the time of the events in question, was living in Florida during the trial. He refused to appear and testify in the plaintiffs' case in chief. The plaintiffs had his deposition read into the record. Rayle then decided that he was willing to testify during the defendants' case. I declined to permit him to do this. Loren-Maltese objects, but does not even argue the point. Her entire reasoning, after stating what Rayle would have testified for the defendants, is that my "refusal to permit Mr. Rayle to testify affected the outcome of the trial and provides additional grounds for granting this motion." Loren-Maltese JML Brief at 16. Affecting

the outcome of the trial is not by itself grounds to grant a new trial.

The decision to exclude Rayle's testimony was not error. Under Rule 611(a) of the Federal Rules of Evidence, I am directed to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of truth, [and] (2) avoid needless consumption of time . . . ." The Southern District of New York has used its "discretion under this Rule to preclude parties who refuse to honor a reasonable request for production of a key witness subject to their control, and thereby force an opponent to use a deposition, from calling the witness to testify personally during their presentation of evidence." *Maran Coal Corp. v. Societe Generale De Surveillance S.A.,* No. 92 CIV. 8728 (DLC), 1996 WL 11230, at *2 (S.D.N.Y. Jan. 10, 1996) (citing *In re Gulf Oil/Cities Service Tender Offer Litig.,* 776 F. Supp. 838 (S.D.N.Y. 1991)). In *Gulf Oil*, a case almost directly on point, the court stated:

> Plaintiffs wish to call [O, a former officer and director of corporate defendant B] during their case in chief. [O] wishes to absent himself during plaintiffs' case, and then decide whether or not it is to his advantage to testify during defendants' case. . . . [O] is a party to this case, and a central figure in the underlying events. If he elects to absent himself during plaintiffs' case, he will not testify at all, and plaintiffs will be free to comment upon his absence.

*Id.* at 839. Loren-Maltese asserts that she lacked control over

-19-

Rayle, but even if I believed her,[3] "[c]ontrol over the witnesses is not dispositive," at least when "the interests of [the corporate defendant] and of [the individual defendant] himself that would be served by having [the individual defendant] stay away during plaintiffs' case and then become available during defendants' case are indistinguishable one from the other." *Gulf Oil*, 776 F. Supp. at 839. That is so here.

## B. Closing Arguments

Loren-Maltese also objects to certain of the plaintiffs' comments in closing argument.

## 1. The "Queen of Hearts" Comment

Presumably inspired by Loren-Maltese's summary suspension of Niebur and Bue, plaintiffs' counsel took a literary turn and referred to Loren-Maltese as "the Queen of Hearts," Trial Tr. at 2033-34, an allusion to the character in Lewis Carroll's story *Alice's Adventures in Wonderland,* who is notorious for announcing: "Sentence first--verdict afterwards."[4] The defendants assert that this allusion was "an improper and very prejudicial personal attack on President Loren-Maltese." They do not explain why. The character is admittedly portrayed by Carroll in an unflattering light –

---

[3] The Town is paying Rayle's attorneys' fees. Trial Tr. at 446.

[4] Lewis Carroll, *Alice's Adventures in Wonderland* 96 (Donald J. Gray ed., W.W. Norton 2d ed. [1865] 1996). The plaintiffs did not quote or paraphrase the remark, leaving the completion of the allusion to the erudition of the jury.

plaintiffs say that she is depicted as "ruthless, vindictive tyrant." That is an overstatement: the Queen of Hearts is a comic character, not a Bloody Mary. However, even had the plaintiffs used a harsher comparison, a major point of the lawsuit was to portray Loren-Maltese in an unflattering light, and the defendants offer no authority that even a striking and vivid literary analogy that emphasizes the point they say the evidence supports is improper.

2. *The "Race Card" Comment*

In closing argument, plaintiffs suggested to the jury that the defendants' treatment of the testimony of Detective Wesley Scott was merely "playing the race card," a cynical and irrelevant racial appeal to the two African-American members of the jury. Scott, who is himself African-American, was involved in some conflict with Niebur after having been directed by Niebur to shave despite his sensitive skin. Trial Tr. at 1682 ff. According to the plaintiffs, the defendants brought this out in an attempt to suggest to the African American jurors that Niebur was racist. *Id.* at 2046-47. Loren-Maltese herself objects that this argument by the plaintiffs was an improper and, indeed, itself a racist appeal.[5]

First, however, not every mention of race is racist; in particular, appeals to the jury not to be swayed by racial considerations are anti-racist. Plaintiffs' counsel called the

---

[5] Once more, Loren-Maltese does not refer me to a particular page in Rayle's 35-page brief (the argument appears on pp. 31-32 of that filing) and Rayle provides no citation to the record.

appeal "offensive." *Id.* The plaintiffs argued that the defendants
had themselves improperly injected race into a trial where it was
not, in the main, an issue, and they urged the jury, and
specifically its African-American members, to ignore race. In the
context of the trial, there appears to be merit in this argument.
However, I need not agree with the plaintiffs' characterization of
the defendants' argument to acknowledge that there was nothing
legally improper in urging jurors to ignore race where it was
irrelevant. It was not calculated to "arouse racial prejudice," in
the language of Rayle's authority, C.R. McCorckle, *Annotation,
Counsel's Appeal to Prejudice*, 99 A.L.R. 2d 1249 § 3 (1965) (no
section number or point cite provided for this reference). Second,
Niebur did not mention Officer Scott's race when he testified about
Scott's behavior. Trial Tr. at 1360-61. Loren-Maltese was the one
who brought up Scott's race, Trial Tr. at 1426-28 ("Q: 'Wesley
Scott was an African-American officer?' A: 'That's correct.'"),
just as she raised the racial issue in discussing Niebur's behavior
at the Hispanic businessperson's lunch (see above). Since race was
raised, the plaintiffs had a right to address it. They did so
within the bounds of the law. The racial reference was not
inflammatory or racist, and the defendants opened the door to it.

### C. Jury Instructions

Loren-Maltese contends that several of my jury instructions
were erroneous. On a motion for a new trial based on improper jury

-22-

instructions, I "ask whether the instructions, when considered in their entirety and not in isolation, were sufficient to inform the jury of the applicable law." *DePaepe v. General Motors Corp.*, 33 F.3d 737, 743 (7th Cir. 1994). If the instruction "failed to convey the correct message to the jury reasonably well," then I ask whether the misleading instruction prejudiced the complaining party. *Dawson v. New York Life Ins. Co.*, 135 F.3d 1158, 1165 (7th Cir. 1998). A party is entitled to a "correct statement of the law," but I need not "deliver instructions describing all valid legal principles." *Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir. 1995).

1. *Loren-Maltese's Individual Liability*

Loren-Maltese says that I *sua sponte* added language to the jury instructions, for which she offers no citation or even a quotation, pertaining to her own liability as an individual. The problems she identifies with the additional language are that it made the instruction more favorable to the plaintiffs and that it unfairly singled out Loren-Maltese by addressing her liability as an individual. In the first place, she did not raise this objection at trial. Trial Tr. at 2056-2058. I in fact changed the instruction in response to counsel's comment. Trial Tr. at 2058, 2071. And it was not unfair to have an instruction on Loren-Maltese's individual liability when she was sued as an individual in this case, particularly when the defendants argued that Loren-Maltese acted

only as a town official.

3. *Pretext*

I declined to instruct the jury on "pretext" using the language Loren-Maltese requested in her Proposed Instruction 7A. She says that her instruction was correct, and that therefore, my refusal to give it created unfair prejudice and confusion. However, she does not explain why omitting this instruction made the jury instructions as a whole misleading and unfairly prejudicial. As noted, I need not instruct on every issue, especially when the principle in question describes a permissible, but not an obligatory, inference. *Gehring,* 43 F.3d at 343. In such cases, I "may and usually should leave the subject to the argument of counsel." *Id.* (citing *United States v. Sblendorio*, 830 F.2d 1382, 1391 (7th Cir. 1987) ("Arguing inferences is standard business among lawyers")). I did so here, and the pretext issue was extensively argued by counsel for all parties.

3. *Defendants' Malicious Prosecution Instruction*

I refused to give the defendants' proposed malicious prosecution instruction, No. 15. They say, without citing any authority, that my instruction left the jury with the wrong impression that the facts of the case were at issue in the jury's instruction of probable cause. This is opaque. Is the jury supposed to set aside the facts of the case in considering whether there was probable cause? An underdeveloped argument unsupported by authority

is waived. This one is also rejected on the merits as incomprehensible.

4. *Rumors, Gossip, and Suspicion*

Loren-Maltese objects that I failed to instruct the jury that "rumors, gossip, and suspicions" are not evidence, and failed to give a proper curative instruction at the time of the improper testimony. Because she fails to identify any testimony that would qualify as "rumors, gossip, and suspicion" being offered in evidence, I treat this objection as waived for lack of factual basis. In closing arguments, the defendants did take the opportunity to urge the jury not to decide on the basis of any rumor, gossip, or suspicion, so they were not prevented from raising this point. *See* Trial Tr. at 1982-83.

5. *Chain of Causation*

Loren-Maltese also argues that I erred in refusing to instruct the jury that intervening causes break the chain of causation. The defendants withdrew this language at the jury instruction conference on May 24, 2001, and so cannot now complain. But even had they not done so, Loren-Maltese does not explain how the omission results in an inaccurate statement of the law or unfair prejudice to her. The plaintiffs indeed must establish a causal relationship between the conduct complained of and the deprivation of their rights, but I did offer instructions on the elements of malicious prosecution and the other claims, including causation.

Parties are "not entitled to their preferred instructions" if the ones given are also correct. *United States v. Brown,* 250 F.3d 580, 587 (7th Cir. 2001). She does not argue that the instruction I gave on malicious prosecution was incorrect.

6. *The No-Jurisdiction Instruction*

I instructed the jury that the Police Board had no jurisdiction over the plaintiffs. Loren-Maltese challenges this instruction with various arguments (not all consistent), but among them, she says that state law provides that the Board could conduct the disputed hearings:

> Except as hereinafter provided, no officer or member of the . . . . police department of any municipality subject to this Division 2.1 shall be removed or discharged except for cause, upon written charges, and after an opportunity to be heard in his own defense. . . .If the . . . the chief of the . . . police department . . . [is] appointed in the manner provided by ordinance, [he] may be removed or discharged by the appointing authority. In such case the appointing authority shall file with the corporate authorities the reasons for such removal or discharge, which removal or discharge shall not become effective unless confirmed by a majority vote of the corporate authorities. The board of fire and police commissioners shall conduct a fair and impartial hearing of the charges, to be commenced within 30 days of the filing thereof . . . .

65 ILCS 5/10-2.1-17. At trial I thought this language ambiguous, and therefore concluded that the contrary language in the Town Ordinances supplemented by the plaintiffs' employment contracts controlled. I decided as a matter of law that the Police Board lacked jurisdiction over the plaintiffs because Cicero Town Ordinance 27-4 states that the superintendent and deputy

superintendent of police "shall serve . . . at the pleasure of the president," but "the power of appointment, discharge or suspensions of all other officers shall be in the [Police] Board." The "pleasure of the president" language was expressly modified in the contracts by explicit language allowing removal only for cause, defined as certain enumerated reasons. The "all other" language excludes the positions held by the plaintiffs from the jurisdiction of the Police Board. The plaintiffs' contracts unambiguously say that the Police Board's power over the discharge or suspension of officers is "pursuant to **Section 27-4 of THE TOWN's Code of Ordinances**" (boldface in original), Employment Agreement ¶ 3(b). Section 27-4 is incorporated by reference into the contract, and therefore the contract itself acknowledged on its face that the Police Board lacked jurisdiction over discharge or suspension of the police chief and deputy chief. The employment agreements were approved by Loren-Maltese and passed by the Town Council. *See* Trial Tr. at 283 (Niebur's contract).

The Illinois Supreme Court did indeed hold in 1973 that "removal of the chief of police and the chief of the fire department in municipalities subject to division 2.1 of article 10 is vested solely in the Board of Fire and Police Commissioners as provided in section 10--2.1--17," *Bovinette v. City of Mascoutah*, 302 N.E.2d 313, 316 (Ill. 1973), but, as Judge Kocoras has noted, the legislature overruled that case in relevant part by amending

-27-

the statute, expressly authorizing municipalities to delegate the
power to remove and discharge police chiefs from the Police Board
to the appointing authority:

> If. . . the chief of the police department [is] appointed in
> the manner provided by ordinance, [he] may be removed or
> discharged by the appointing authority. In such case the
> appointing authority shall file with the corporate authorities
> the reasons for such removal or discharge, which removal or
> discharge shall not become effective unless confirmed by a
> majority vote of the corporate authorities.

65 ILCS 5/10-2.1-4. The amended language omits reference to a
Board hearing. Judge Kocoras concluded that a municipality now has
the right to exempt the police chief entirely from Board
jurisdiction. *See Robinson v. Akins,* No. 89 C. 5413, 1990 WL 71285,
at *12 (N.D. Ill. May 7, 1990); *Gorr v. Bd. of Fire and Police
Comm'rs*, 494 N.E.2d 1221, 1224 (Ill. App. Ct. 1986); *Mandarino v.
Lombard*, 414 N.E.2d 508, 509 (Ill. App. Ct. 1980). I agree.

Loren-Maltese admits this in her opposition to the plaintiff's
motion to reconsider, but argues that the amended statute still
permits concurrent Board jurisdiction. That is beside the point
here; the plaintiffs' contracts and the Town's ordinances control,
and they divest the Board of jurisdiction in Cicero and in the
plaintiffs' case here. The Town's argument that the ordinance does
not do this at all because it does not do so expressly is
unpersuasive. As explained, there is no other sensible
interpretation of the plain language of Section 27-4. If the Board
has jurisdiction over "all other officers," it lacks jurisdiction

over the police chief and his deputy. There was no error here.

Loren-Maltese says that it does not matter whether the Police Board has jurisdiction because, under *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), no specific type of hearing is required as long as the plaintiffs received some sort of hearing. See Loren-Maltese JML Brief at 38. But, as explained below, if the Police Board had no jurisdiction over the plaintiffs, they did not receive due process in being haled before it. *See Rolles v. Civil Service Comm'n*, 512 F.2d 1319, 1326-27 (D.C. Cir. 1975) (no due process without jurisdiction); *Zatz v. United* States, 149 F.3d 144, 146 (2d Cir. 1998) (same); *Howard v. FAA*, 17 F.3d 1213, 1218 (9th Cir. 1994) (same).

### D. Insufficiency of the Evidence

Loren-Maltese argues that the jury verdicts were not supported by "substantial evidence"--she means sufficiency of evidence. To warrant judgment as a matter of law because of legal insufficiency of evidence, there must have been "no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." *Sheehan v. Donlen Corp.*, 173 F.3d 1039, 1043, 1044 (7th Cir. 1999). "Attacking a jury verdict is a hard row to hoe." *Id.* I consider "whether the totality of the evidence supports [the] verdict," and will not disturb the jury verdict unless Loren-Maltese "can show that 'no rational jury could have brought in a verdict against [her].'" *Id.* (citations omitted). I view the

-29-

evidence as a whole "in the light most favorable to the party
against whom the motion is directed." *Campbell v. Peters,* 256 F.3d
695, 699 (7th Cir. 2001).

## 1. *The Due Process Liberty Verdict*

The elements of the due process liberty claim are that the
defendant: (1) participated in discharging the plaintiff, (2)
accompanied the discharge proceedings with false public charges
that made it unlikely that anyone would hire the plaintiff, (3)
failed to afford plaintiff a hearing at which he could attempt to
clear his name, resulting in (4) damages to plaintiff proximately
caused by that defendant's conduct. *See McMath v. City of Gary,
Ind.,* 976 F.2d 1026, 1031 (7th Cir. 1992); Jury Instruction No. 10.

Loren-Maltese attacks the evidence presented under (2), saying
that the false public charges against the plaintiffs that she made
did not "accompany" the discharge proceedings, because they were
made in the Spring of 1998, in connection with the plaintiffs'
suspension, but the plaintiffs were discharged in the *Fall* of 1998,
at which time Loren-Maltese made no statements. She cites *Newton v.
Chicago School Reform Bd. of Trustees,* No. 96 C 7078, 1997 WL
603838, at *7 (N.D. Ill. Sept. 24, 1997) (Plunkett, J.)
(Stigmatizing information defendants may have disclosed about
plaintiffs two months prior to discharge insufficient to support
due process claim.) (no point cite provided), and *Siegert v.
Gilley,* 500 U.S. 226, 234-35 (1991) (alleged defamation contained

-30-

in a letter written several weeks after plaintiff's resignation was not incident to discharge) (no point cite provided).

But first, Loren-Maltese's claim about her later silence is false. In mid-July 1998, in fact, speaking at the Town Board meeting where it was decided to call Bue back, she implied that Bue was tied to organized crime because he had an uncle who was a mobster--a totally unsupported allegation. Trial Tr. at 351, 678-79, 1961. Given the circumstances of this case, with the evidence of a protracted campaign against the plaintiffs, I do not think that as a matter of law even the false and defamatory comments in the spring were too remote, nor that a rational jury could not find that they were connected to Loren-Maltese's ultimate discharge of the plaintiffs.

Second, this case was also about the deprivation of liberty interests involved in Loren-Maltese's *suspension* of the plaintiffs, and most of her stigmatizing statements occurred on and around April 24, 1998, the day of their suspension. The law protects government employees against suspension as well as discharge without due process of law. "Before a liberty interest is implicated, there must be 'some tangible alteration of a "status."'" *Ratliff v. City of Milwaukee*, 795 F.2d 612, 625 (7th Cir. 1986) (*citing Paul v. Davis*, 424 U.S. 693 (1976) (Being posted as a shoplifter does not implicate liberty interest because injury to reputation alone is insufficient)). Suspension is manifestly a

change of status, and the same elements apply *mutatis mutandis. See Winegar v. Des Moines Ind. Comm. Sch. Dist.*, 20 F.3d 895, 900 (8th Cir. 1994) (suspension of teacher without predeprivation hearing created material issue of fact for trial); *Bailey v. Kirk,* 777 F.2d 567, 578 (10th Cir. 1985) (police chief's suspension actionable under due process).

Third, Loren-Maltese says that "an unelaborated charge of 'incompetence, neglect of duty and malfeasance of office' is of a different order of magnitude than charges of dishonesty, immorality, disloyalty, . . . , alcoholism or narcotics violations." *Hadley v. DuPage County,* 715 F.2d 1238, 1245 (7th Cir. 1983) (citing *Adams v. Walker*, 492 F.2d 1003, 1008-09 (7th Cir. 1974)). She avers that she only accused the plaintiffs of neglect of duty and refusal to follow orders. However, the evidence at trial was not that Loren-Maltese made "unelaborated charges" of neglect, but that she accused the plaintiffs of refusing to cooperate truthfully in an investigation, suborning false reports from employees, stealing town records, discriminating against minority police officers, jeopardizing Internal Affairs investigations, leaking confidential criminal background checks to third parties, and being AWOL. These charges were announced to the press and published in the Town Newsletter. Only the AWOL charge is within the scope of the exclusion in *Hadley* and *Adams*, but the rest of the charges--lying, stealing, leaking, obstructing--are enough

to escape that exclusion and allow for liability for violations of due process rights.

Loren-Maltese also attacks the evidence presented under element (3), arguing that the plaintiffs had an opportunity to clear their names before the Police Board, but turned it down. However, a public employee dischargable only for cause is "entitled to at least an abbreviated pretermination 'hearing,'" *Duncan v. Wis. Dept. of Health and Family Servs.*, 166 F.3d 930, 936 (7th Cir. 1999). Due process may require only "abbreviated pre-termination processes where full post-deprivation processes are available," *Chaney v. Suburban Bus Div. of Regional Transp. Auth.*, 52 F.3d 623, 630 (7th Cir. 1995), but barring some special circumstances that do not obtain here, even if there had been adequate post-deprivation processes available, "abbreviated" does not mean "none at all."

Second, any hearing before a panel that lacks jurisdiction would not be constitutionally adequate. For this reason, Loren-Maltese's argument that the plaintiffs also failed to exhaust their state remedies by appealing its determination is a nonstarter. *See Gilbert v. National Transp. Safety Bd.* (9th Cir. 1996) (When agency lacks the authority to review such claims, a petitioner need not exhaust the claims before seeking judicial review.). Likewise with the argument that Loren-Maltese did not participate in the Police Board hearings and did not actually participate in the wrongdoing. There was persuasive evidence to the contrary: Loren-Maltese

suspended the plaintiffs without a hearing, and offered them only the empty review before a panel that lacked jurisdiction.

Finally, Loren-Maltese argues that the plaintiffs failed to prove element (4) of their due process liberty claim, that their damages were proximately caused by her wrongful acts. First, she says that Bue was reinstated and given all back pay and benefits. However, he was also later fired, and the jury disbelieved the lawful reason Loren-Maltese offered for this decision, *viz.*, his noncompliance with the residency requirement. This was a credibility determination, and "[i]t is the jury's job to weigh the evidence." *Knox v. Indiana*, 93 F.3d 1327, 1332 (7th Cir. 1996). Because there was a "reasonable basis in the record for [that] verdict," I will not "reweigh the evidence but will let the verdict stand." *Id.* That is also the answer with respect to Loren-Maltese's argument that she would have fired them anyway because they disobeyed her orders. The jury could rationally have found that reason pretextual. Finally, Loren-Maltese asserts that the plaintiffs offered no evidence that the denial of procedural due process caused their injuries, so are entitled only to nominal damages. However, the plaintiffs suffered years of loss of comparable employment that the jury could have rationally believed was due to Loren-Maltese's false and stigmatizing public charges of lying, stealing, leaking, and obstructing. The evidence supports a finding of proximate cause.

2. *The Malicious Prosecution Verdict.*

To state a claim for malicious prosecution, the plaintiffs must allege facts showing (1) the commencement or continuance of an civil or criminal judicial proceeding by the defendant, (2) the termination of the proceeding in the plaintiffs' favor, (3) the absence of probable cause for the proceeding, (4) the presence of malice, and (5) damages to the plaintiff resulting from the commencement or continuance of that proceeding. *Swick v. Liautaud,* 662 N.E.2d 1238, 1242 (Ill. 1996); Jury Instruction No. 15.

In this case, I have determined that the Police Board hearings involved a civil judicial proceeding. 90 F. Supp. 2d 930, 931 (N.D. Ill. 2000). Loren-Maltese argues, with respect to element (1), that no reasonable jury could have concluded that she caused the charges against the plaintiffs before the Police Board because I instructed the jury that as a matter of law, the Police Board lacked jurisdiction. That makes no sense. A rational jury could have concluded that Rayle brought the charges at Loren-Maltese's behest and that no other explanation made sense.

Loren-Maltese also argues that there was no evidence presented, with respect to element (2), that the proceedings terminated in favor of either plaintiff. However, Bue was initially reinstated, so the proceedings did terminate in his favor.

Niebur was not reinstated. The proceedings against him were dropped. *See* Trial Tr. at 368. The docket shows that at a

settlement conference of October 15, 1998, Judge Marovich of this court, to whom this case was previously assigned, ruled that the plaintiffs' motion to enjoin the Police Board hearing planned for Niebur was moot. The parties stipulated that Niebur was terminated, but nobody seems to know by whom or how. Loren-Maltese says that she did not fire him, or did not know whether it was done by her, or the Police Board, or the Town Board. In fact, she said that as far as she knew, "he hasn't showed up to work in three years, for years." Trial Tr. at 368. Nothing in the record that I can find shows that he was ever formally fired, rather than merely not reinstated. *See id.* at 370.

However, in Illinois, a termination of proceedings that is less than an adjudication on the merits may be a termination in favor of the plaintiff if the circumstances surrounding the abandonment of the proceedings indicate that the plaintiff was innocent and the proceedings were prosecuted as far as they were without probable cause and from malice. Terminations that "do not rise to the level of adjudications on the merits may satisfy the termination requirement." *Cult Awareness Network v. Church of Scientology Int'l*, 685 N.E.2d 1347, 1353 (Ill. 1997). "Whether a withdrawal or an abandonment constitutes a [favorable] termination. . . . and whether the withdrawal is evidence of a lack of probable cause for their initiation, depends upon the circumstances under which the proceedings are withdrawn." *Id* at 1352 (citing

*Restatement (Second) of Torts* § 674)). "[I]f the dismissal was merely a formal means of securing a negotiated settlement," or if the "dismissal was entered in order to enable the plaintiff to file the claim in another forum," that is not a "favorable termination." But "an involuntary dismissal resulting from plaintiff's failure to comply with discovery serves as a favorable termination due to the fact that a party who fails to produce evidence, in essence, fails to prosecute." *Id.* A favorable termination may be found "where the legal disposition gives rise to an inference of lack of probable cause." *Id. See also Swick*, 662 N.E.2d at 1243 (a *nolle prosequi* may serve as a favorable termination unless abandonment was for reasons not indicative of the innocence of the accused). "The circumstances surrounding the abandonment of the . . . proceedings must compel an inference that there existed a lack of reasonable grounds to pursue the criminal prosecution." *Id.* Mere dismissal or nonprosecution of the charges is not enough; there has to be something from which one can draw a positive inference of innocence.

As noted, there never was a formal termination of the Police Board hearings here. Of course, because the Board had no jurisdiction, it could neither have exonerated them nor convicted them. That is not the issue here, however, where the question of

jurisdiction is a side issue;[6] the issue is whether the termination of the hearings (however empty) was such as to raise an inference of innocence. Under the Illinois Supreme Court's holding in *Cult Awareness Network* and *Swick,* proceedings may be found to have terminated favorably even if they were abandoned, even if the charges are dismissed or, as here, not prosecuted, if the circumstances of the abandonment allow an inference of innocence. Had the hearings been abandoned because the defendants had concluded that the Board lacked jurisdiction, no such inference could be drawn. But of course the defendants did no such thing. However, one may draw the inference of innocence from lack of probable cause and the presence of malice.

Therefore, the inquiry as to Niebur under element (2) turns on the results of the inquiry into element (3), the absence of probable cause, and element (4), the presence of malice. In a civil malicious prosecution case, probable cause was defined as "such a state of facts as would lead a [person] of ordinary caution and prudence to believe that he has a justiciable claim to prosecute against the defendant." *Knox County v. Midland Coal Co.,* 640 N.E.2d 4, 8 (Ill. App. Ct. 1994). "It is the state of mind of the one commencing the prosecution, and not the actual facts of the case or

---

[6] A defendant cannot avoid a malicious prosecution charge by railroading a plaintiff before a body that lacks jurisdiction, imposing damages upon him as a result of this prosecution, and then pleading lack of jurisdiction. Of course, the defendants still insist that the Board has jurisdiction.

the guilt or innocence of the accused, which is at issue." *Burghardt v. Remiyac*, 565 N.E.2d 1049, 1052 (Ill. App. Ct. 1991). I construe this to mean reasonable belief, not subjective motivation, which is the malice inquiry.

The evidence concerning the conduct for which the plaintiffs were supposedly suspended was the same for Niebur and Bue, but Bue was reinstated. The facts alleged are the same for both plaintiffs, so the jury might have rationally concluded that there was no probable cause to suspend or fire Niebur either. Viewing the evidence "in the light most favorable to the party against whom the motion is directed," *Harbor Motor Co., Inc. v. Arnell Chevrolet-Geo, Inc.,* 265 F.3d 638, 644 (7th Cir. 2001), I agree that "the evidence presented, combined with the reasonable inferences permissibly drawn therefrom, is sufficient to support the verdict." *Id.* Because under *Scientology,* 685 N.E.2d at 1352, a favorable termination may be found where the legal disposition gives rise to an inference of lack of probable cause, a rational jury could have found on this evidence that Bue's reinstatement gives rise to the inference that there was no probable cause in Niebur's case either. There were no significant differences in their situation. Bue was not an underling following orders, he was the number two man in the department, and no evidence exists in the record that suggests that Niebur ordered him not to cooperate.

An alternative and entirely independent basis for finding lack of probable cause exists. The jury determined that Loren-Maltese's testimony about why she suspended Niebur was not credible, and that the proffered reasons were false and pretextual, and it might rationally have done so. Of course, the probable cause inquiry is objective, but the jury apparently have rationally concluded that Loren-Maltese was lying about most of the supposed bases for her decision (missing squad cars on the streets, allegedly racist remarks, and the like) and that the remaining ones (cooperating with a federal investigation, refusing to cooperate with Rayle's investigation, etc.) were not ones that would reasonably provide a basis for summary suspension and termination, and that summary action was not rationally justified in any event as discussed above in connection with the analysis of pretermination due process.

Malice, element (4), is the initiation of a prosecution for any reason other than to bring a party to justice. *Rodgers v. Peoples Gas, Light & Coke Co.*, 733 N.E.2d 835, 842 (Ill. App. Ct. 2000). Malice is proved by showing that "the prosecutor was actuated by improper motives." *Swick*, 662 N.E.2d at 1247 (McMorrow, J., concurring). It is the subjective element. Lack of probable cause does not itself establish malice, but the trier of fact may infer malice from lack of probable cause if there is no other credible evidence which refutes that inference. *Rogers v. Peoples Gas, Light & Coke Co.,* 733 N.E.2d 835, 842 (Ill. App. Ct. 2000). As

-40-

noted, the jury rejected Loren-Maltese's testimony about why she suspended Niebur, and it might rationally have done so. That is enough to show malice as well. The jury might also have found malice from the suspicious timing of Loren-Maltese's action as soon as she learned of the plaintiffs' cooperation with the federal authorities. Because the jury rationally rejected Loren-Maltese's legitimate reasons as pretextual, *see Koulegeorge v. Illinois Human Rights Comm'n*, 738 N.E.2d 172, 181 (Ill. App. Ct. 2000) (suspicious timing a basis for finding pretext), and could have rationally found that she was motivated at least by a desire for retaliation, the conditions for malice were satisfied. Payback is an improper motive for a prosecution. The jury's retaliatory firing and First Amendment retaliation verdicts against the Town, acting through its agents, notably Loren-Maltese, suffice for determination that payback was her motivation.

Finally, a malicious prosecution case requires "special damages" to reputation that affect one's job prospects. Loren-Maltese admits that there was evidence of loss of reputation, but denies that this was enough. That is true, but, as I have explained, the evidence of obstacles to employment caused by reputational injuries is sufficient, 90 F. Supp. 2d at 931 (citing *Hahn v. Village of Downers Grove*, No. 98 C 7281, 1999 WL 167036, at *5 (N.D. Ill., Mar. 19, 1999) (Kocoras, J.)), and such evidence was presented. In his own JML Brief, Rayle has a lengthy and erudite

discussion of the special damages rule, see id. at 16-25, the main point of which is that the damages involved must be above and beyond the normal expense and distress of defending against even maliciously instituted proceedings.

Rayle's argument addresses my conclusion that the plaintiffs had such damages by contending that their inability to obtain employment is "an unfortunate but natural result of having to defend themselves in such proceedings." Id. at 22. This is not correct. First, the plaintiffs declined to defend themselves in the proceedings in front of the Police Board because they correctly thought it lacked jurisdiction over them, and because they believed that it was a sham. At trial, I agreed with the first proposition.[7] Second, the evidence was rather than the occupational roadblocks were due to Loren-Maltese's unjustified summary suspension, and publication, in cooperation with Rayle, of false and stigmatizing statements about the plaintiffs.

Rayle also argues that Hahn, on which I relied, represents an improper extension of Illinois law because Illinois courts do not acknowledge lost income as "special damages." He refers me to Serfecz v. Jewel FoodStores, 67 F.3d 591 (7th Cir. 1995) (lost rental income), Equity Assocs. v. Village of Northbrook, 524 N.E.2d

_____

[7] I also note that the jury could rationally have accepted the second on the basis of the evidence in the record because, among other things, the Police Board was headed by Loren-Maltese's appointee, indebted to her for several other positions, Clarence Gross.

1119 (Ill. App. Ct. 1988)(loss of potential tenants), *Balthazar v. Dowling*, 382 N.E.2d. 1257 ((Ill. App. Ct. 1978) (lost income), and *Petrick v. Kaminski*, 386 N.E.2d 636 (Ill. App. Ct. 1979) (lost wages). Of these, only the last case is even possibly pertinent, but the employment obstacles in this case involve more than lost wages. They involve loss of careers or vocations to which the plaintiffs had life-long commitments. *Hahn* stands for the proposition that, while a loss of reputation is not enough for special damages or injury under a malicious prosecution claim, reputational injury *plus a* "claim that [plaintiff] is unable to obtain a comparable position . . . as a result of the Defendants' conduct sufficiently alleges 'special injury.'" Judge Kocoras said that there may be "future employment roadblocks for [plaintiff] as a result of the . . . proceedings. . . . [T]he stain on his professional record may be permanent." *Hahn*, 1999 WL 167036, at *5. I believe *Hahn* to be an accurate prediction of what the Illinois courts would do here. Therefore the special damages requirement is satisfied.

E. Loren-Maltese's Qualified Immunity Defense

The jury found Loren-Maltese had violated the plaintiffs' liberty interest in their jobs by making false and stigmatizing statements about them. Loren-Maltese argues that she was entitled to qualified immunity on these claims. Qualified immunity protects "all but the plainly incompetent or those who knowingly violate the

-43-

law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To overcome the qualified immunity defense, the plaintiffs must establish that (1) the alleged conduct makes out a constitutional violation, and (2) the constitutional standards were clearly established at the time of the alleged violation. *Rakovich v. Wade*, 850 F.2d 1180, 1210 (7th Cir. 1988). The contours of the right must be sufficiently clear that a reasonable official would understand that his action violates that right. *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The inquiry therefore is purely objective unless subjective intent is a necessary element of the underlying constitutional claim. *Auriemma v. Rice*, 910 F.2d 1449, 1453 (7th Cir. 1990).

The plaintiffs contend that Loren-Maltese waived this argument with respect to the plaintiffs' due process liberty claims because she asserted the qualified immunity defense only with respect to their First Amendment claims and not with respect to their due process claims. Loren-Maltese says "not true," but fails to provide any citation to the record indicating any particular place where she did raise the defense with regard to this claim. However, she does appear to have come close enough to raising it at the motion hearing of May 2, 2001, to avoid waiver. I therefore proceed to the merits of the defense with respect to the plaintiffs' due process liberty claim.

The leading case on due process in this context is *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985). Public

-44-

employees who can only be dismissed for cause, in the ordinary case, "are entitled to oral or written notice of the charges against them, an explanation of the employer's evidence, and an opportunity to present their side of the story *prior* to their discharge." *Id.* at 546) (emphasis added). In "'a garden variety summary dismissal' (*i.e.,* not an unusual situation where pre-deprivation procedures would be impossible or impracticable) public employees are entitled to some form of pre-deprivation inquiry." *Patkus v. Sangamon-Cass Consortium,* 769 F.2d 1251, 1265 (7th Cir. 1985) (citing *Parrett v. City of Connersville*, 737 F.2d 690 (7th Cir. 1984) (constructive discharge); *see also Altman v. Hurst*, 734 F.2d 1240 (7th Cir. 1984)). If "a party is given notice and an opportunity to respond at a pre-termination hearing, due process has been afforded." *Draghi v. County of Cook*, 184 F.3d 689, 693 (7th Cir. 1999) (*citing Loudermill*, 470 U.S. at 546)). A pre-deprivation hearing is not an "absolute" requirement; *see Gilbert v. Homar*, 520 U.S. 924, 930 (1997); "where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause." *Id.* at 924; *see also Zinermon v. Burch*, 494 U.S. 113, 128 (1990) (collecting cases). But the defendants point to nothing indicating that a reasonable Town President would have concluded that the events of April 24, 1998, posed such an unusual case as to abrogate the normal requirement for a pre-disciplinary

hearing. In the circumstances, there was nothing impossible or impracticable about a pretermination hearing.

In the context of a suspension, the Supreme Court has disapproved of "summary suspensions without a presuspension hearing." *Barry v. Barchi,* 443 U.S. 55, 63 (1979) (no pre-suspension hearing required there, however) (racehorse doping case). The Court stated that "probable cause" was required to "impose an interim suspension, pending a prompt judicial or administrative hearing that would definitely determine the issues." *Id.* The jury here found that Loren-Maltese lacked probable cause to suspect wrongdoing, and (for reasons stated below) I agree that a rational jury could have come to that conclusion. Therefore that particular condition precedent for denying the plaintiffs a presuspension hearing had been clearly established for over 20 years, and was lacking here.

I conclude, therefore, that in suspending and firing the plaintiffs in the manner in which it was done, without a pretermination hearing or adequate post termination hearing, publication of false and stigmatizing charges that damaged the plaintiffs' chances for employment, Loren-Maltese violated the plaintiffs' constitutional rights to due process liberty, and these rights were clearly established at the time. Any reasonable mayor would have known that one cannot summarily suspend police officials, lie about their competence and honesty to the press and

the community, and deny them any hearing other than one before a Board expressly denied jurisdiction by Town ordinance and their contracts.

Loren-Maltese argues that I instructed the jury that a pre-suspension hearing was required for due process, but that I was wrong because in fact a post-suspension hearing would satisfy constitutional requirements. However, the jury instruction on the due process liberty claim (No. 10) reads in relevant part that the jury was to find a violation if, among other things, the defendants "failed to afford Plaintiff a hearing at which he could clear his name." It said nothing about whether the hearing had to be pre- or post-deprivation.

Loren-Maltese argues that the plaintiffs waived their right to a name-clearing hearing when they refused to participate in such hearings after the suspension. The refusal to participate in a post-suspension hearing can hardly waive the plaintiffs' right to a pre-suspension hearing, however. *See Morton v. Beyer*, 822 F.2d 364, 368 (3d Cir. 1987) ("The availability of extensive post-termination procedures does not eliminate the essential requirement of due process that a hearing be provided before discharge."); *accord Gniotek v. City of Philadelphia*, 808 F.2d 241, 243 (3d Cir. 1986). Furthermore, the evidence, and the docket of this case, showed that the plaintiffs did not ignore the hearing, but brought a motion before Judge Marovich to enjoin it on the

-47-

grounds that the Police Board lacked jurisdiction. I discuss this matter more below.

Loren-Maltese argues that a public official may publicly disclose charges against a discharged employee if she provides effective post-deprivation remedies. She invokes *Rosenstein v. City of Dallas, Tex.*, 876 F.2d 392, 395 (5th Cir. 1989). The *Rosenstein* court said that "public officials do not act improperly in publicly disclosing charges against discharged employees, but they must thereafter afford procedural due process to the person charged." *Id.* at 395; *see also Strasburger v. Board of Educ., Hardin County Community Unit School Dist. No. 1*, 143 F.3d 351, 356 (7th Cir. 1998) (The "remedy available to a discharged employee who proves all the elements of the cause of action is a name-clearing hearing.").

A hearing before a Board that lacked jurisdiction, however, would not satisfy the requirement of an adequate post-deprivation hearing. *See Rolles v. Civil Serv. Comm'n*, 512 F.2d 1319 (D.C. Cir. 1975). In that case, a Reserve Officer who was deprived of his civil service job after accusations of misconduct in his military position was not required to go before a military board that lacked jurisdiction in order to vindicate his rights as a civilian employee. *Id.* at 1326. Where the Board lacked jurisdiction, "[i]t [wa]s manifest that appellant was . . . denied any real opportunity to clear his name and defend himself." *Id.* at 1327; *see also Zatz*

-48-

*v. United States*, 149 F.3d 144, 146 (2d Cir. 1998) (No due process violation when "petitioners failed to argue before the Board that it lacked jurisdiction," suggesting by negative implication that jurisdiction is required for a meaningful opportunity to be heard).

Finally, Loren-Maltese falls back on the defense that even if she violated a clearly established constitutional right in suspending the plaintiffs without a prior hearing, her action was "objectively reasonable," *Anderson v. Creighton*, 483 U.S. 635, 641 (1987) ("Law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present, and . . . those officials--like other officials who act in ways they reasonably believe to be lawful--should not be held personally liable."), because she consulted with Rayle, then Town Counsel. Loren-Maltese says, without a record citation, that Rayle told her that no FBI agent had the right to order the plaintiffs to refuse to cooperate with the Town's investigation, and he also "advised [her] relative to the suspension." Neither of these facts establish reasonable belief in probable cause. The FBI's authority is irrelevant--as noted, no one except she says that the FBI ordered anyone to do anything, and Loren-Maltese does not say what Rayle's advice on the suspension was. *See* Tr. Trans. at 334-337, 341, 1651. Rayle does state in his own JML Motion that he advised her to suspend the plaintiffs, but that is not evidence. There is no evidence in the record about what he said beyond Loren-Maltese's

-49-

self-serving statements. Rayle himself stated in his deposition that could recall nothing about the events in question. See Tr. trans. 511-20 ("I have no recollection"; "I have no independent memory"; "I do not recall"; "I have no clue, no memory, no knowledge.")

It would be too easy to get qualified immunity if a public official automatically had "reasonable belief" when she consulted an attorney on the matter, whatever the lawyer said about the proposed action. Loren-Maltese cites no authority to support the implausible proposition that consulting with a lawyer makes one's beliefs per se objectively reasonable, a conceit flattering to attorneys, but generally lacking in merit. Although I am not obligated to do a party's legal research, *United States v. Williams*, 877 F.2d 516, 518-19 (7th Cir. 1989), there is an unreported Seventh Circuit case granting police qualified immunity in part because they consulted an attorney. *Salzer v. Dellinger*, No. 91-3475, 1995 WL 283986 (7th Cir. Apr. 21, 1995). However, there the police did independent inquiry into the law, which was untested, and there was evidence in the record that the attorney advised them that the contested action was proper. The appeals court concluded that "[u]nder these facts, we conclude that the deputy sheriffs did not violate any clearly established right." *Id.* at *4. There is no evidence that Loren-Maltese undertook any independent inquiry beyond consulting Rayle; the law of due process

liberty is familiar and not untested, and there is nothing in the record that indicates what advice Rayle offered.

### F. State Statutory Immunity

Loren-Maltese also claims statutory immunity as an official performing discretionary functions and acting within the scope of her duties under the Illinois Tort Immunity Act, 745 ILCS 10/2-202. First, this defense is waived. It is an affirmative defense, *Michigan Ave. Nat. Bank v. County of Cook*, 732 N.E.2d 528, 535 (Ill. 2000) ("The immunities afforded to units of local government under the Tort Immunity Act operate as an affirmative defense which, if properly raised and proven by the public entity, precludes a plaintiff's right to recover damages."). The Tort Immunity Act defense was not raised until the submission of jury instructions, and I declined to instruct the jury on the defense. Federal Rule of Civil Procedure 8(c) requires a defendant to plead any affirmative defenses in his answer to the complaint. I have discretion to allow an answer to be amended to assert an affirmative defense not raised at the outset, Fed. R. Civ. P. 15(a), but I am not obliged to do so. This is not a case where the "pertinence of a particular defense may only become apparent after discovery, . . . in which case it would be reasonable for the court to permit the belated assertion of that defense." *Venters v. City of Delphi,* 123 F.3d 956, 967 (7th Cir. 1993). The availability of this defense was "reasonably apparent" long before the beginning of

trial, but Loren-Maltese failed to "alert the parties and [me] to h[er] intent to pursue that defense." *Id*. It would violate the point of the affirmative pleading requirement to allow her to "ambush a plaintiff with an unexpected defense." *Id*.

The defense would lack merit in any event. It could not be asserted against a § 1983 claim, for obvious reasons, *see Hampton v. City of Chicago*, 484 F.2d 602, 607 (7th Cir. 1973) (Stevens, J.). With regard to the state law malicious prosecution claim, the Illinois Tort Immunity Act, 745 ILCS 10/2-202, "immunizes liability for negligence and expressly does not immunize liability for wilful and wanton misconduct." *Barnett v. Zion Park Dist.*, 665 N.E.2d 808, 814 (Ill. 1996). Loren-Maltese says that the plaintiffs failed to provide evidence of wanton and wilful behavior, but she is wrong. The statute defines "[w]ilful and wanton conduct" as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property." 745 ILCS 10/1-210. Credible evidence was presented that Loren-Maltese lied in public about the plaintiffs' conduct in a stigmatizing way, and suspended them from duty for no good reason, and had them railroaded on phony charges before a Board that lacked jurisdiction, as was evident from the plaintiffs' contracts. That does not bespeak mere negligence, but "actual and deliberate intention to cause harm." Therefore the plaintiffs had plenty of

evidence that Loren-Maltese was guilty of wanton and wilful misconduct.

G. Ex Parte Communications

1. *Judge Marovich*

Loren-Maltese argues that I engaged in improper ex parte communication with Judge Marovich, and with an Assistant United States Attorney who was involved in the federal investigation of the Town and Loren-Maltese. Loren-Maltese cites no legal authority whatsoever to indicate that my conduct was improper. Therefore, as is normal under those circumstances when a party is represented by counsel, the objection is waived. *See United States v. Papia*, 910 F.2d 1357, 1363 (7th Cir. 1990) (litigant must present an argument accompanied by relevant authority); *Indurante v. Local 705, Int'l Bhd. of Teamsters,* 160 F.3d 364, 366 (7th Cir. 1998) ("[p]erfunctory and undeveloped assertion" waived).

The merits would be wanting in any event. Loren-Maltese presumes that any communication regarding the case must be an ex parte one if she was not involved in it. The actual legal standard is more nuanced. "A judicial proceeding . . . is said to be ex parte when it is taken or granted at the instance and for the benefit of one party only and without notice to, or contestation by, any person adversely interested." *C & F Packing Co., Inc. v. Doskocil Cos., Inc.*, 126 F.R.D. 662, 688 (N.D. Ill. 1989) (Rovner, J.) (citing *Black's Law Dictionary* (5th ed. 1979)); *D'Acquisto v.*

*Washington*, 640 F. Supp. 594, 621 (N.D. Ill. 1986).

The conversation with Judge Marovich occurred when counsel for the parties represented to me that, as discussed above, when the case was before Judge Marovich, he had entered, in a settlement conference, an order terminating the proceedings before the Police Board and that this order was the reason that the Police Board proceedings had not continued against Niebur. Pretrial Conf. Tr., Apr. 16, 2001, at 37-39, Apr. 25, at 29-37. No order to that effect was ever entered. Therefore, encountering Judge Marovich, I asked him whether he remembered such an order. Although there was no notice, all parties had the opportunity to respond when I disclosed the conversation on the record, *see* Trial Tr. at 787-88. In fact there was discussion at the April 25 pretrial conference about the possibility that Judge Marovich would have to be consulted about what had occurred. *Id*. at 37. The communication with Judge Marovich, moreover, did not involve any parties.

2. *The Assistant United States Attorney*

The argument that I had improper ex parte communication with an Assistant United States Attorney is equally baseless. The fact of the meetings was announced to all parties beforehand, Pretrial Conf. Tr., April 16, 2001, at 46-47, April 24, 2001, at 9, and though the meetings were *in camera,* they were also on the record. *See* In-Camera Hearing Tr., April 16, 2001, April 24, 2001. No parties were present. The United States Attorney's Office (not

represented by the individuals involved in prosecuting the criminal case) wanted to inform me that Loren-Maltese was about to be indicted. I was concerned that, if the indictment were handed down during the trial, that would prejudice her civil case, and we discussed the possibility that no indictment would be announced in her case until the civil trial was over. Tr of In-Camera Hearing, April 16, 2001, at 3. Loren-Maltese offers no basis in fact, and has none, for her conclusory assertion that the meeting "was designed to present the Court with one-sided information damaging to Defendants." On the contrary, the meeting was intended to ensure that Loren-Maltese received a fair trial. The second, even shorter, conversation on April 24 concerned an order entered by Judge Aspen in connection with the grand jury proceedings a year or more previously that prevented the testimony of the two FBI agents who were to be called as witnesses by the plaintiffs. After the conference, I disclosed the order to counsel and referred them to Judge Aspen for an order permitting the depositions of the agents to go forward as defendants wished.

### H. *Damages*

Finally, Loren-Maltese attacks the damages awards. The jury awarded compensatory damages of $911,000 to Niebur and $801,000 to Bue. Each plaintiff was also awarded $50,000 for emotional distress, $50,000 for loss of reputation, $50,000 in punitive damages against Loren-Maltese, and $25,000 in punitive damages

against Rayle.

1. *Emotional Injuries*

Loren-Maltese argues, first, that the plaintiffs did not prove their emotional injuries. She refers to *Brady v. Fort Bend County*, 145 F.3d 691 (5th Cir. 1998), and *Price v. City of Charlotte,* 93 F.3d 1241 (4th Cir. 1996), where the courts rejected as insufficient to recover for emotional damages uncorroborated testimony by the plaintiffs themselves that the defendant's wrongful acts led them to be "highly upset," caused marital and family problems, sleeplessness, anxiety, stress, weight loss or gain, and devastation. *Brady*, 145 F.3d at 718-19. There the plaintiffs either had not shown "specific manifestations" of emotional harm and in other cases had not shown the nature, extent, and severity of that harm. *Id.; accord Price*, 93 F.3d at 1255. However, the Seventh Circuit has not established any requirement that claims of emotional injury must be supported by corroborating testimony. *See Avitia v. Metropolitan Club of Chicago*, 49 F.3d 1219, 1227-29 (7th Cir. 1995) (plaintiff's testimony enough). In general, because emotional damages are difficult to describe, it will often suffice to describe their causes, and appeal to the jury's understanding of what it would be like to have to endure such abuse.

Here, the jury rationally could have found that Bue was insultingly suspended without any notification, enticed back with

some trepidation, then fired after Loren-Maltese lied to him about the enforcement of the residency requirement. Niebur learned about his suspension when Cicero police officers came to his house, confiscated his police gear, badge, and signs of office; he was subjected to an intimidating parade of Cicero police officers driving by his home and pointing at him, and went to clean out his office the next day in fear. He received back his personal effects and memorabilia dented, smashed, and broken. Both he and Bue were attacked by Loren-Maltese in public, without prior notice, and accused of lying, stealing, obstruction, insubordination, and incompetence--by someone who had recently praised them, and in Niebur's case, had been personally involved in his family life. Niebur, his reputation devastated and unable to find employment in his life's work, testified that he misses the job every day. Bue felt inadequate as a person, and both suffered financial and professional worries--Bue going to the brink of bankruptcy. The jury could have rationally concluded that there was evidence of a shocking display of vindictiveness and betrayal by Maltese over an extended period, and that this supported the plaintiffs' testimony that they suffered depression, fear, and humiliation, as well as anxiety about their professional and financial situation. The evidence was sufficiently concrete in character, and detailed enough about its nature, extent, and severity, to support the awards for emotional damages.

## 2. *Reputational Injury*

Loren-Maltese's objection that the plaintiffs have not shown reputational injury is terse, conclusory, and unsupported by legal authority or citations to the record. Loren-Maltese JML Brief at 49. *See also United States v. Giovannetti*, 919 F.2d 1223, 1230 (7th Cir. 1990) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is a good point despite a lack of supporting authority or in the face of contrary authority, forfeits the point."). Even if the point were not waived, it is frivolous. Niebur's run for Sheriff of Joplin, Missouri, after the incident does not show that he suffered no reputational damage. He did not, after all, win, and there was testimony that his experience in Cicero prevented at least one voter from supporting him. Likewise it shows nothing at all that Bue "considered" running for mayor of Hanover Park, Illinois. The defendants cite to no authority supporting the proposition that a showing of reputational injury requires third-party or expert support or cannot be sustained by merely the testimony of the plaintiffs alone. In fact, negative publicity alone can support an award for reputational damages. *Busch v. Burkee*, 649 F.2d 509, 519 n.13 (7th Cir. 1981).

## 3. *Compensatory Damages*

Loren-Maltese asserts that the compensatory damages award is "grossly excessive." Her argument is, first, that the plaintiffs

failed to prove any noneconomic injuries, and, second, that the awards for intangible injuries were excessive. The first claim is unargued and in any event untrue: as discussed, the plaintiffs presented evidence that they suffered distress, belittlement, and humiliation due to Loren-Maltese's conduct. Trial Tr. at 674-80, 1367-77. The second claim is refuted by the first case Loren-Maltese cites, in which the Seventh Circuit surveys cases upholding damages for claims under 42 U.S.C. § 1983 resulting from illegitimate firings, and notes that these "ranged from a low of $500 to a high of over $50,000." *EEOC v. AIC Sec. Investig., Ltd.,* 55 F.3d 1276, 1286 (7th Cir. 1995). The awards here of $50,000 for each plaintiff are in line with those awards, and so not disproportional.

4. *Punitive Damages*

Loren-Maltese challenges the jury's punitive damages award of $100,000 ($50,000 each for the two plaintiffs) as excessive and disproportionate, and because it was not allocated to any particular claim. Her objections are cursory, unsubstantiated, and frivolous. She asserts that the size of the award in light of the record shows that the jury was motivated by passion and prejudice, citing *Auster Oil & Gas, Inc. v. Stream,* 835 F.2d 597 (5th Cir. 1988). But in that case "the ratios of the punitive damages awards to remittiturs . . . ranged from 5 to 1 for [one plaintiff] to a stunning 50 to 1 for [another]," *id.* at 603, whereas here the the

punitives were $50,000 each and the compensatory damages award was over $1.5 million, a ratio of 1 to 15.

The Fifth Circuit case, moreover, would not appear to be good law after *BMW of North Am., Inc. v. Gore,* 517 U.S. 559 (1996) (affirming an award of $4,000 in compensatory damages and $4 million in punitive damages). There the Supreme Court said that, in deciding a challenge to a punitive damages award, I am to consider "the degree of reprehensibility of the [conduct]; the disparity between the harm or potential harm suffered by [the plaintiff] and his punitive damages award; and the difference between this remedy and the civil penalties authorized or imposed in comparable cases." *Id.* at 574-75.

First, reprehensibility: The defendant in *Gore* lied to a car purchaser about selling him a repainted vehicle. Loren-Maltese destroyed the jobs, reputations, and careers of two police officers with an unconstitutional campaign of defamation and malicious prosecution. Her misconduct was far worse. Second, proportionality to harm: the plaintiff in *Gore* was sold a repainted car instead of a new one, a comparatively minor loss. The plaintiffs here lost not only their jobs but their vocations--a major loss. Third, disparity between the compensatories and the punitives in similar cases: Loren-Maltese fails to cite any similar cases, but my research indicates that the award was not disproportionate. For example, when the mayor of Mission, Kansas, wrongfully fired an assistant

police chief and defamed him in public, the Tenth Circuit affirmed an award of $20,000 as compensation (other than employment compensation) for the injuries he suffered as a result of damage to his reputation and punitive damages of $7,500 in connection with the liberty interest deprivation. *Miller v. City of Mission*, 705 F.2d 368, 373 (10th Cir. 1983). Here, the plaintiffs won $100,000 each for loss of reputation and emotional distress, *i.e.,* other than lost wages, and $50,000 each against Loren-Maltese in punitives; the ratios are comparable, and the figures from *Miller* reflect amounts from 20 years ago, when the value of a dollar was more than twice what it is now. *See also Williams v. Board of Regents of Univ. Sys. of Georgia*, 629 F.2d 993, 998 (5th Cir. 1980) (affirming award for wrongfully fired and defamed police officer of one cent in nominal damages, $16,000 in compensatory damages and $20,000 in punitive damages against one defendant, and one cent in nominal damages, $4,750 in compensatory and $8,000 in punitive damages against another).

5. *Miscellaneous*

The rest of Loren-Maltese's objections to the damages repeat previous arguments: denial of personal involvement--the Town did it, not she; and she didn't influence the Town in its decisions. She points to nothing in the record that indicates that the jury was irrational not to accept that story. She also argues that she is entitled to a new trial or judgment as a matter of law because

the jury did not indicate under which of the counts it imposed the punitive damages. She cites *Braun v. Flynt,* 726 F.2d 245, 251 (5th Cir. 1984), a case dealing with double compensation rather than with punitive damages. Finally, she says that the act of the Police Board on May 4, 1998, suspending the plaintiffs without pay, breaks the chain of causation and cuts off damages against her. However, the jury might have rationally rejected Loren-Maltese's story that she had no influence over the Police Board, which included her appointees and associates, like Clarence Gross.

## II. Scott Rayle's Absolute Immunity Argument

Rayle contends that he is entitled to absolute immunity because he acted as a prosecutor.[8] The Supreme Court has held that state prosecutors are absolutely immune from liability under § 1983 for their conduct in "initiating a prosecution and in presenting the State's case," *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976), insofar as that conduct is "intimately associated with the judicial phase of the criminal process," *id.* at 430. Appearing before a judge and presenting evidence in support of a motion for a search warrant involved the prosecutor's "'role as advocate for the

---

[8] The plaintiffs argue that Rayle waived this defense by not raising it until the final pretrial order, but it is listed as an "Agreed Contested Issue[] of Law," which waives the waiver objection. And for this issue of law, the final pretrial order is not too late, since it does not affect the plaintiffs' trial preparation, except insofar as, if I find a defendant absolutely immune before trial, the plaintiffs are spared the trouble of trying a case against him.

State.'" *Burns v. Reed*, 500 U.S. 478, 489 (1991), but prosecutors are not entitled to absolute immunity for their actions in giving legal advice to the police. *Id.*

Rayle is a private attorney who has worked for the Town in a number of capacities. The question here is whether he should be accorded the absolute immunity due a state prosecutor for any of his activities in connection with this case. I am to use a "functional approach" that looks to "the nature of the function performed, not the identity of the actor who performed it." *Buckley*, 509 U.S. at 269. The fact that Rayle was a private attorney acting for the Town, therefore, while relevant, is not decisive. Private attorneys may have prosecutorial immunity in the proper circumstances. *See, e.g., Hollowell v. Gravett*, 703 F. Supp. 761, 764 (E.D. Ark. 1988) (absolute immunity for private attorney hired to prosecute administrative dismissal proceeding against officers of the sheriff's department).

I therefore undertake an analysis of the specific functions that Rayle performed which are relevant to this case, bearing in mind that the Supreme Court has said that "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley*, 509 U.S. at 273. Absolute immunity protects "acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State,"

-63-

including "professional evaluation of the evidence assembled by the police and appropriate preparation for its presentation at trial or before a grand jury after a decision to seek an indictment has been made." On the other hand, "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings are not entitled to absolute immunity." *Id.* at 273. The plaintiffs presented evidence of the following acts committed by Rayle:

(1) He participated with Loren-Maltese in suspending the plaintiffs, supposedly on the grounds of disobedience and mismanagement, after learning that they had communicated with the FBI. Trial Tr. at 336. As noted, in his deposition testimony, he said that he could not remember this, but the jury was entitled to disbelieve him. The Supreme Court has held that "those officials who are responsible for the decision to initiate or continue a proceeding subject to agency adjudication are entitled to absolute immunity from damages liability for their parts in that decision," *Butz v. Economou,* 438 U.S. 478, 516 (1978), as long as the official act in question is within the scope of the official's judicial function. *Id.* at 511-12. The suspension here was plainly an administrative decision and not a judicial or prosecutorial act, imposed by the Town President Loren-Maltese, on her own version of the story, to maintain discipline over disobedient subordinates and

not to determine guilt or innocence.

(2) Rayle called and participated in a press conference to announce this action. Statements "to the media also are not entitled to absolute immunity." There is "no 'common-law immunity for a prosecutor's . . . out-of-court statements to the press.'" *Buckley*, 509 U.S. at 276 (citation omitted).

(3) Rayle brought charges against the plaintiffs before the Police Board. This was a prosecutorial act, but because the Board lacked all jurisdiction by the plain language of the Town ordinances and the plaintiff's contracts, Rayle is not entitled to absolute immunity. A prosecutor "will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction.'" *Stump v. Sparkman,* 435 U.S. 349, 356-57 (1978) (citing *Bradley v. Fisher*, 80 U.S. 335 (1871)). Rayle acted in clear absence of all jurisdiction here. Rayle is not entitled to absolute immunity on any of the grounds on which he was sued.

### III. The Police Board

I grant the Police Board judgment as a matter of law because its acts were the Town's. *See Norris v. Waymire,* 114 F.3d 646, 646 to 114 F.3d 646, 647 (7th Cir. 1997) ("The naming of the Town's Police Department as a defendant adds nothing; it is almost certainly not a suable entity separate from the Town.").

IV. The Town of Cicero

A. The Plaintiff's Federal Claims

The plaintiffs contend that the Town has waived its municipal liability argument by failing to intone the magic words "municipal liability" in its directed verdict motion and at close of trial, but federal litigation rarely requires the use of a precise formula. *See Sisters of the Third Order of St. Francis v. SwedishAmerican Group Health Benefit Trust*, 901 F.2d 1369, 1371 (7th Cir. 1990) (ERISA plan context). It is generally enough if the meaning is discernable. Although it would have been better had the Town been somewhat more forthcoming, the Town did raise at the appropriate times the argument that there was no other basis of liability against it than the acts of its agents, and if they were cleared, the Town should have no liability. This directly implies that the Town lacked municipal liability. There are limits to the extent to which argument by enthymemic presupposition will preserve a point for further review. However, it did so here.

I grant judgment as a matter of law to the Town on the First Amendment and due process property claims. As the Town says, the jury inconsistently found against the Town on the First Amendment and due process property claims, but not against the agents who committed the underlying acts. Although a municipality cannot be held liable for the actions of individual employees under 42 U.S.C. § 1983 based on a theory of *respondeat superior*, *Monell v.*

*Department of Soc. Servs. of the City of New York*, 436 U.S. 658, 691 (1978), liability under § 1983 "requires a finding that the individual officer[s are] liable on the underlying substantive claim." *Treece v. Hochstetler*, 213 F.3d 360, 364 (7th Cir. 2000) (*quoting Tesch v. County of Green Lake*, 157 F.3d 465, 477 (7th Cir. 1998)); *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (no award of damages against a municipality based on the actions of one of its officers when in fact the jury has concluded that the officer inflicted no constitutional harm).

The plaintiffs won jury verdicts that the Town had deprived them of their due process liberty and property interest in their employment, and that the individual defendants, but not the Town, had deprived them of their due process property interest in their employment. The Town fails to offer an independent argument on the due process liberty claim, instead incorporating the arguments of the other defendants. For reasons explained above, the Town's motion for judgment as a matter of law or a new trial on the due process liberty claims are denied.

### B. Retaliatory Discharge

The elements of the Illinois retaliatory discharge count are: (1) that plaintiff was discharged; (2) that the discharge was in retaliation for his or her activities; and (3) that the discharge violates a clear mandate of public policy. *Zimmerman v. Buchheit of Sparta*, Inc., 645 N.E.2d 877, 880 (Ill. 1994). "[P]ublic policy

concerns what is right and just and what affects the citizens of the State collectively. It is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions." *Palmateer v. International Harvester Co.*, 421 N.E.2d 876, 878 (Ill. 1981). There is a clear public policy favoring investigation and prosecution of criminal offenses. "Public policy favors the exposure of crime, and the cooperation of citizens possessing knowledge thereof is essential to effective implementation of that policy." *Id.* at 879.

The Town relies mainly on the issue of pretext, contending that it had good reason to discipline the plaintiffs, and that that is why it suspended and fired them. It raises no other issues with respect to the retaliatory discharge count, and all other issues are therefore waived. There is, in any event, no adequate response to the rational conclusion reached by the jury, which did not believe the Town, determining instead that the plaintiffs were disciplined because of their cooperation with the federal investigation, and not for some other legitimate reason. The jury's inconsistent verdict resulted in judgment as a matter of law for it on the First Amendment claim, but the jury's reasonable factual determinations about retaliation for speaking out stand.

Causation is the other side of pretext. If the plaintiffs' protected speech caused them to be disciplined, then the defendants' legitimate reasons were pretextual. The jury reasonably

so found here. In showing causation, the plaintiffs may not rely on "speculation based on suspicious timing alone" but must "produce facts which somehow tie the adverse decision to the plaintiffs' protected actions," *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000) (First Amendment retaliation case), and mere prior knowledge by the supervisor of the protected activity is also insufficient by itself, *Sanchez v. Henderson*, 188 F.3d 740, 747 (7th Cir. 1999) (same). However, suspicious timing together with other facts can establish causation. *Johnson v. University of Wisc.-Eau Claire,* 70 F.3d 469, 481 (7th Cir. 1995) (same, summary judgment context). Here it is conceded that Loren-Maltese knew of the communications with the FBI, and suspended the plaintiffs the day after they were subpoenaed. Moreover, the "factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to [establish liability]." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993). This was a credibility issue, and "questions of witness credibility are reserved for the jury, and its assessments will not [normally] be second guessed by [a district court]." *United States v. Woolfolk*, 197 F.3d 900, 904 (7th Cir. 1999). In sum, there was prior knowledge, suspicious timing, and the jury's determination that the Town's legitimate reasons were mendacious. The inference of retaliation stands.

Although this is a post-trial motion, the Town casts its
discussion of pretext in terms of the *McDonnell Douglas* framework,
and says, accordingly, that I erred in refusing to instruct the
jury on pretext as part of that framework's required showing. The
*McDonnell Douglas* framework, however, "is designed to help
plaintiffs raise an inference of discrimination during pretrial
proceedings. After the trial on the merits, the burden-shifting
apparatus has served its purpose and the required preliminary
showings fall away." *Diettrich v. Northwest Airlines, Inc.*, 168
F.3d 961, 965 (7th Cir. 1999). In any event, the Town was certainly
able to argue the issue of pretext and legitimate reasons for its
action to the jury at great length, and I have concluded that the
jury's rejection of its version of events was justified.

In connection with the pretext arguments, the Town states
rather vaguely that I erred in allowing the plaintiffs to introduce
evidence regarding their state of mind as to their investigation of
Ram and town officials, and also abused my discretion in
prohibiting state of mind evidence regarding the Town's legitimate
reasons. This objection is waived because it is unsupported by
specific citations to the record. *See Hulbert v. Wilhelm*, 120 F.3d
648, 657 (7th Cir. 1997); *Waldridge v. American Hoechst Corp.*, 24
F.3d 918, 922 (7th Cir. 1994); *Bonds v. Coca-Cola Co.*, 806 F.2d
1324, 1328 (7th Cir. 1986). It is also untrue. I permitted a great
deal of testimony on the Town's purported reasons for the

disciplinary actions against the plaintiffs, including testimony about the beliefs of Town officials, noted elsewhere this opinion.

## C. Breach of Contract

The Town was found liable for breach of contract towards both plaintiffs. It argues that, notwithstanding the verdict, it was the plaintiffs and not the Town that breached the contract. With regard to Niebur, the Town invokes the clauses of his employment contract allowing him to be terminated for willful malfeasance, ¶ 8(B)(5), or if he failed to perform his obligations under the contract, ¶ 8(B)(2), and to abide by reasonable policies and decisions of the President, ¶ 3(C). In this connection, the Town points to the evidence that Niebur refused to comply with Loren-Maltese's orders not to hand over the towing records to the Illinois State Police and refused to cooperate with Rayle's investigation of the towing scandal.

The interpretation of a contract in Illinois is a matter of law, but whether there was "wilful malfeasance" or whether Loren-Maltese's orders were "reasonable" are factual questions for the jury. In view of Maltese's prior knowledge, the suspicious timing, and the jury's determination that the Town's legitimate reasons were phony, the jury could have rationally believed that the Town's investigation was a whitewash and Loren-Maltese's orders were intended to cover up wrongdoing, and that Niebur was justified in refusing to go along with either. In that case, his disobedience

-71-

was not malfeasance, and her orders were not reasonable.

With respect to Bue, the Town argues that he was finally terminated because he failed to comply with the residence requirement. Employment Agreement ¶ 5. The jury did not believe that either, and rationally so, in part in view of the evidence already set forth under Niebur's case, and in part because it believed Bue's testimony that Loren-Maltese agreed to a subsequent oral modification of the contact allowing Bue more time to look for a house in Cicero.

## V. Conclusion

I Deny Betty Loren-Maltese's and Scott Rayle's motions for a new trial or judgment as a matter of law on the plaintiffs' malicious prosecution claims. I Deny as Moot Clarence Gross' claims for qualified immunity; Gross has been dismissed from this case. I Deny Betty Loren-Maltese's and Scott Rayle's motion for a new trial on the plaintiffs' due process liberty claims, and I Deny Loren-Maltese's motion for qualified immunity, and her motion to reduce or set aside the damages assessed. I Grant the Town's motion for judgment as a matter of law on the plaintiffs' First Amendment and due process property claims. I Deny the Town's motions for a new trial on the plaintiffs' claims of due process liberty violations. I Deny the Town's motions for judgment as a matter or law or a new trial on the plaintiffs' claims of breach of contract, retaliatory discharge, and malicious prosecution. I also Grant the Police

Board's motion for judgment as a matter of law.

**ENTER ORDER:**

_Elaine E. Bucklo_
**Elaine E. Bucklo**
United States District Judge

Dated:    May 15, 2002